USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 98-2207

 JOHN E. PEARSON,

 Appellant,

 v.

 FIRST NH MORTGAGE CORPORATION,
 WADLEIGH, STARR, PETERS, DUNN & CHIESA,
 CITIZENS BANK OF NEW HAMPSHIRE,
 VICTOR DAHAR, Trustee, and
 GERALDINE KARONIS,

 Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

 [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

 

 Before

 Lynch, Circuit Judge,

 Coffin and Cyr,

 Senior Circuit Judges.

 

 Daniel A. Laufer for appellant.
 Bruce A. Harwood, with whom Richard P. O'Neil and Sheehan Phinney
Bass + Green Professional Association were on brief, for appellees First
N.H. Mortgage Corporation and Citizens Bank New Hampshire.
 S. William Dahar II, with whom Victor W. Dahar and Victor W. Dahar,
P.A. were on brief, for appellee Victor W. Dahar, Trustee.
 John V. Dwyer, with whom Kevin M. Leach and McLane, Graf, Raulerson
& Middleton Professional Association were on brief, for appellee
Wadleigh, Starr, Peters, Dunn & Chiesa.

 

 December 29, 1999
 

 CYR, Senior Circuit Judge. Chapter 7 debtor John E.
Pearson seeks to set aside a bankruptcy court order which dismissed
his motion for relief from a compromise settlement of all chapter
7 estate claims against First N.H. Bank ("First Bank") following
its affirmance by the district court on intermediate appeal. See
Fed. R. Bankr. P. 9024. Pearson contends that the compromise
settlement was the product of a fraud perpetrated upon the
bankruptcy court by his former chapter 7 counsel, the chapter 7
trustee, and First Bank.
 We vacate the district court judgment and remand to the
bankruptcy court for further proceedings.
 I
 BACKGROUND
 In January 1985, Pearson and the Tamposi family ("the
Tamposis") formed Bradford Woods, Inc. ("BWI"), to develop and
market condominiums in Merrimack, New Hampshire. Pearson and the
Tamposis owned one-half interests in BWI, which obtained its
construction financing from First N.H. Mortgage Corp. and First
Bank. First Bank's counsel, Wadleigh, Starr, Peters, Dunn & Chiesa
("Wadleigh Firm"), prepared the BWI loan documentation, including
the personal guaranties provided to First Bank by Pearson and the
Tamposis.
 When the New Hampshire real estate market soured in 1989,
First Bank declined to accommodate BWI's requests to restructure
the loan. After the Tamposis rejected Pearson's proposal that each
contribute more capital to keep BWI afloat, or that BWI file a
chapter 11 petition, Pearson retained William Gannon, Esquire, a
Wadleigh Firm partner, to commence a civil proceeding in New
Hampshire Superior Court (No. 89-E-1231) for a declaratory judgment
directing the Tamposis to submit the Pearson proposal to
arbitration under the terms of their joint venture agreement. 
 First Bank called the BWI loan in November 1989. 
Although First Bank notified BWI, Pearson, and the Tamposis of the
foreclosure sale in April 1990, the Tamposis, who were represented
by the Wadleigh Firm, interposed no opposition. Instead, through
the Wadleigh Firm and with First Bank's cooperation, the Tamposis
incorporated Spring Pond Development Corp. ("Spring Pond"), which
proceeded to acquire the BWI condominium units at the foreclosure
sale. First Bank provided the mortgage financing for the customers
to whom Spring Pond resold the BWI condominium units. First Bank
also assigned to the Tamposis the $498,595.81 liability Pearson had
incurred with First Bank pursuant to his personal guaranty of the
BWI construction loan made by First Bank.
 The BWI condominium foreclosure sale was followed by a
succession of lawsuits. First, in October 1990 Pearson brought a
pro se action against First Bank, the Tamposis, and Spring Pond in
New Hampshire Superior Court (No. 90-E-1082), alleging that First
Bank and the Tamposis had utilized the BWI foreclosure action part
of a conspiracy to deprive him of his 50% interest in BWI, in
violation of the fiduciary duties the Tamposis owed BWI. In
addition to demanding compensatory and punitive damages, Pearson
sought to set aside both the BWI foreclosure sale and his personal
guaranty of the First Bank loan to BWI.
 Next, in December 1990 the Tamposis brought suit against
Pearson in New Hampshire Superior Court (Nos. 90-E-1263 & 1264) to
recover the $498,595.81 due under the personal loan guaranty given
by Pearson to First Bank and later assigned to the Tamposis by
First Bank. Following the objections interposed by the Tamposis to
the Wadleigh Firm's appearance as Pearson's counsel, the Wadleigh
Firm withdrew from these actions, citing "the involvement of [First
Bank] in the Bradford Woods foreclosure" as posing "potential
conflicts of interest."
 In April 1992, Pearson, represented by Attorney Gannon,
filed for chapter 7 relief. Gannon submitted an application for
appointment as chapter 7 counsel for Pearson, together with the
required verified statement that Gannon had "no connections with
the Debtor's [i.e., Pearson's] creditors or any party in interest,
their respective attorneys, and accountants." See Fed. R. Bankr.
P. 2014(a). Although the chapter 7 schedules Gannon prepared for
Pearson listed both First Bank and the Tamposis as creditors, no
mention was made of any conflict-of-interest claim Pearson may have
held against the Wadleigh Firm.
 In September 1994, the chapter 7 trustee submitted an
application for authorization to employ Attorney Gannon as special
counsel for the Pearson chapter 7 estate, to litigate all estate
claims other than those involving First Bank itself. In another
verified statement submitted pursuant to Bankruptcy Rule 2014(a)
shortly thereafter, Gannon represented to the bankruptcy court: 
"In [my] opinion, there is no conflict of interest which prevents
[me] from acting as Special Counsel to the Trustee . . . since the
Special Counsel is not being retained to represent the Trustee in
connection with the claims asserted against Bedford (sic) Woods and
First N.H. Banks, Inc. where [the Wadleigh Firm's] representation
of Spring Pond Development would create a conflict of interest." 
Once the application had been approved by the bankruptcy court,
Gannon proceeded to settle all chapter 7 estate claims against the
Tamposis.
 On October 12, 1995, after experiencing difficulty in
retaining counsel to litigate the chapter 7 estate claims against
First Bank, the chapter 7 trustee submitted an application to
appoint Gannon as special counsel to the chapter 7 estate for that
purpose as well. Although Gannon acknowledged that the Wadleigh
Firm had incorporated Spring Pond, he represented to the bankruptcy
court that the recent settlement with the Tamposis had
"eliminate[d] any conflict of interest as between Pearson and the
Tamposi Defendants." Gannon further explained: "Since the
Pearson-Tamposi conflict has been resolved and the Wadleigh Law
Firm never represented [First Bank] in connection with any of the
events referred to in the Damage Complaint or acquired any insight
or knowledge from its representation of [First Bank] in other
matters which would prejudice its former client in the State Court
Suit, it believes that it can properly represent the Trustee in
this Case."
 The application to appoint Gannon special counsel to the
chapter 7 estate was approved by the bankruptcy court on the
following day in an ex parte order. Shortly thereafter, First Bank
objected to the Gannon appointment on conflict-of-interest grounds
and Gannon in turn moved to vacate the ex parte order of
appointment pending hearing.
 Three days before the scheduled hearing on the chapter 7
trustee's motion to appoint Gannon as special counsel, First Bank
and the chapter 7 trustee arrived at an agreement to compromise all
chapter 7 estate claims against First Bank. At that point, Gannon
and the chapter 7 trustee withdrew, as moot, the motion to appoint
Gannon special counsel to prosecute all chapter 7 estate claims
against First Bank.
 Several months later, on March 28, 1996, the bankruptcy
court approved the compromise settlement jointly proposed by First
Bank and the chapter 7 trustee, whereby First Bank would pay the
chapter 7 estate $40,000, and the chapter 7 estate in turn would
release First Bank and its "parents, subsidiaries, affiliates,
officers, directors, agents, employees, attorneys or
representatives" from all liability. Following the compromise
settlement with First Bank, Gannon ceased all representation of
Pearson on the ground that a dispute had arisen between them
regarding Gannon's attorney fees. Thereafter, Pearson retained
present counsel.
 Almost a year later, in February 1997, the chapter 7
trustee submitted a motion to abandon, as burdensome, certain
chapter 7 estate property consisting of "[a]ny and all conflict of
interest and breach of the duty of loyalty claims relative to the
Wadleigh Law Firm and its attorney William S. Gannon, if any." See
Bankruptcy Code 554, 11 U.S.C. 554. First Bank promptly
responded that the chapter 7 trustee's motion proposed to abandon
claims previously released in the March 28, 1996 compromise
settlement between the chapter 7 estate and First Bank.
 At that point Pearson moved to vacate the March 28, 1996
compromise settlement between the chapter 7 trustee and First Bank,
see Fed. R. Bankr. P. 9024, on the ground that the chapter 7
trustee had acted in concert with Gannon and First Bank to conceal
Gannon's conflict of interest from the bankruptcy court and thereby
preclude Pearson from pursuing a malpractice claim against Gannon
and the Wadleigh Firm.
 At a hearing held June 23, 1997, on (i) the chapter 7
trustee's motion to abandon all chapter 7 estate claims against the
Wadleigh Firm and Gannon, and (ii) Pearson's Rule 9024 motion to
set aside the March 28, 1996 order approving the compromise
settlement between First Bank and the chapter 7 trustee, the
bankruptcy court ruled that Pearson must prove "fraud on the court"
by clear and convincing evidence. At the same time, it declined to
allow either preliminary discovery or an evidentiary hearing unless
and until Pearson first produced a "smoking gun" indicating that
the chapter 7 trustee, the Wadleigh Firm, or First Bank, intended
to conceal a conflict of interest material to the compromise
settlement previously approved on March 28, 1996.
 Thereafter, the bankruptcy court ruled that Pearson had
not met its threshold "smoking gun" standard. In re Pearson, 210
B.R. 500 (Bankr. D. N.H. 1997). The district court affirmed in an
unpublished opinion on intermediate appeal.
 II
 DISCUSSION
 On appeal from the district court, we review for clear
error the factual findings made by the bankruptcy court; its
conclusions of law are reviewed de novo. See Adams v. Coveney, 162
F.3d 23, 25 (1st Cir. 1998). A bankruptcy court order rejecting a
motion to set aside a final compromise order under Bankruptcy Rule
9024 may not be disturbed on appeal absent an abuse of discretion. 
See, e.g., Golfland Enter. Ctrs., Inc. v. Peak Inv., Inc. (In re
BCD Corp.), 119 F.3d 852, 857 (10th Cir. 1997).
 Appellant Pearson contended below that these appellees
(i) deliberately concealed from the bankruptcy court that Attorney
Gannon had undertaken to represent the chapter 7 estate
notwithstanding an irreconcilable conflict of interest (i.e., the
Wadleigh Firm's previous representation of the Tamposis and First
Bank); (ii) knowingly drafted the 1995 compromise expressly to
release the Wadleigh Firm and its partners, Gannon and William
Tucker, Esquire, from all potential legal malpractice claims by
chapter 7 debtor Pearson; and (iii) maneuvered to preclude a
bankruptcy court ruling on the conflict-of-interest issue as part
of its March 1996 assessment of the compromise terms.
 At the hearing held on June 23, 1997, the bankruptcy
court noted that normally the finality of compromise settlements in
bankruptcy cases must be respected. The court then went on to rule
that Pearson would be allowed neither the preliminary discovery nor
the evidentiary hearing he had requested unless he first produced
a "smoking gun" indicating that appellees had acted with intent to
perpetrate a fraud on the court.
 Although the ultimate burden to prove "fraud on the
court" by clear and convincing evidence rested with Pearson, see
Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989), the
bankruptcy court did not cite, nor have we found, any authority for
invoking its "smoking gun" standard as a sine qua non for either
preliminary discovery or an evidentiary hearing. On the contrary,
whatever authority does exist suggests that once the record
evidence demonstrates a "colorable" claim of fraud, the court may
exercise its discretion to permit preliminary discovery and
evidentiary proceedings. See, e.g., Hall v. Doering, 185 F.R.D.
639, 644 n.4 (D. Kan. 1999) (fraud on the court); cf. also, e.g.,
Rothenberg v. Kamen, 735 F.2d 753, 754 (2d Cir. 1984) (settlement
procured by fraud).
 In fraud cases, the "colorable claim" standard is more
appropriate than the "smoking gun" standard because claimants who
have been denied both preliminary discovery and an opportunity to
present witnesses may well be left with no meaningful access to
direct evidence of fraudulent intent, notwithstanding an abundance
of telltale circumstantial evidence. In such circumstances, trial
courts must be vested with adequate discretion to determine in the
first instance whether the particular facts warrant discovery and
post-discovery proceedings.
 Accordingly, we now apply the "colorable claim" test,
rather than the "smoking gun" standard, for determining whether the
bankruptcy court abused its discretion in rejecting the Rule 9024
motion submitted by Pearson. To that end, we address seriatim the
record evidence regarding: (1) the nature of the alleged conflict
of interest; (2) appellees' alleged concealment of any conflict
from the bankruptcy court; (3) Pearson's alleged waiver of any
conflict of interest; and (4) the alleged harm caused the chapter
7 estate by appellees' deception.
 A. Conflict of Interest
 In the event the Wadleigh Firm either formerly or
concurrently represented in a substantially related matter an
entity with an interest materially adverse to Pearson, the
applicable ethical standards plainly prohibited any member of the
Wadleigh Firm from representing Pearson in these bankruptcy
proceedings. See New Hampshire Rules of Professional Conduct 1.7,
1.9, 1.10 ["NHRPC"]. Rule 1.9 contemplates careful inquiry into
four factors: "First, there must have been a valid attorney-client
relationship between the attorney and the former client. Second,
the interests of the present and former clients must be materially
adverse. Third, the former client must not have consented, in an
informed manner, to the new representation. Finally, the current
matter and the former matter must be the same or substantially
related." Sullivan Cty. Reg'l Refuse Disposal Dist. v. Town of
Acworth, 686 A.2d 755, 757 (N.H. 1996) ("Acworth") (emphasis
added). It is clear from the record on appeal that the first,
second, and fourth factors announced in Acworth obtained in the
present case.
 In state court action No. 90-E-1082, filed in October
1990, Pearson alleged, inter alia, that the Wadleigh Firm had
represented First Bank during 1985-86 in originating the BWI
construction loan documentation, and that beginning in 1989 First
Bank unlawfully conspired with the Tamposis and Spring Pond to
deprive Pearson of his one-half interest in BWI. As regards the
latter allegation, the bankruptcy court itself explicitly
acknowledged that Attorney Gannon's subjective view that he had not
acted under any conflict of interest may have been "faulty,"
Pearson, 210 B.R. at 502; a candid characterization which
inexplicably failed to receive due consideration in the ex parte
order approving the chapter 7 trustee's motion to appoint Attorney
Gannon as special counsel.
 Thus, given the stark allegations made by Pearson in
state court action No. 90-E-1082, see supra Section I, the Wadleigh
Firm was precluded from undertaking to represent Pearson, either at
the same time as or after representing the Tamposis and First Bank. 
Moreover, the record on appeal demonstrates that the Wadleigh Firm
actually represented "materially adverse" interests in
"substantially related" matters. See NHRPC 1.9(a); cf. Kevlik v.
Goldstein, 724 F.2d 844, 851 (1st Cir. 1984), cited in NHRPC 1.7,
1.9 committee notes to decisions; cf. also Borges v. Our Lady of
the Sea Corp., 935 F.2d 436, 439-40 (1st Cir. 1991) (same). The
Wadleigh Firm was representing First Bank when it originated the
BWI loan documents, which included the First Bank loan guaranties
executed by Pearson and the Tamposis. Pearson later brought suit
against the Tamposis and First Bank seeking to have these same loan
guaranties declared void (No. 90-E-1082), and the Tamposis later
sued Pearson to recover the post-foreclosure deficiency due under
Pearson's First Bank loan guaranty (Nos. 90-E-1263 & 1264). 
Indeed, it is not unlikely that the Wadleigh Firm members who
drafted these BWI loan documents could have been called as material
witnesses in these actions. See NHRPC 3.7 ("A lawyer shall not act
as advocate at a trial in which the lawyer is likely to be a
necessary witness . . . .").
 Second, the present record does not appear to support the
bankruptcy court finding that William Tucker, Esquire, a Wadleigh
Firm partner, "was involved [only] in some fairly routine matters"
involving BWI and the 1990 foreclosure. Pearson, 210 B.R. at 503. 
Instead, Attorney Tucker served both as a First Bank director and
a member of its Senior Lending Committee, which was charged with
"ratify[ing] actions on existing loans." Thus, presumably Tucker
would have been entitled to vote on the Tamposis' refinancing plan
and on whether to call the BWI loan in 1989.
 Third, Spring Pond was established by the Tamposis and
First Bank to acquire the BWI real estate at foreclosure, an
integral element in the alleged conspiracy between First Bank and
the Tamposis to deprive Pearson of his interest in BWI. Moreover,
the Spring Pond articles of incorporation reflect that in April
1990 Attorney Tucker and another Wadleigh Firm partner incorporated
Spring Pond Development Corporation.
 Fourth, Attorney Tucker served as a mediator between
First Bank and the Tamposis' counsel prior to the BWI foreclosure
sale, when First Bank insisted that a potential problem with BWI's
real estate title be resolved as a prerequisite to any refinancing
loan.
 Finally, Attorney Gannon explained in writing to Pearson
in 1991 that the Wadleigh Firm could not represent him in the civil
action which the Tamposis filed against Pearson, see supra Section
I, because the Wadleigh Firm's earlier representation of First Bank
gave rise to "irreconcilable professional conflicts."
 Thus, the record plainly includes considerable evidence
of serious conflicts of interest which could tend to divide
Attorney Gannon's loyalties, as between Pearson's interests and the
interests of Pearson's creditors, particularly First Bank. At the
very least, then, the record before the bankruptcy court
preliminarily demonstrated a "colorable claim" that appellees
either knew or had reason to know that any representation of
Pearson by the Wadleigh Firm in these chapter 7 proceedings was
potentially conflicted.
 B. The Alleged Concealment of Conflicts of Interest
 We next consider whether Pearson established a colorable
claim that appellees may have concealed a conflict of interest from
the bankruptcy court. "'[F]raud on the court' occurs where it can
be demonstrated, clearly and convincingly, that a party has
sentiently set in motion some unconscionable scheme calculated to
interfere with the judicial system's ability impartially to
adjudicate a matter." Aoude, 892 F.2d at 1118, quoted in Fernandez
v. Leonard, 963 F.2d 459, 462 (1st Cir. 1992); Pearson, 210 B.R.
at 501 (Fraud on the court is an "intentional deflecting of the
Court from knowing all the facts necessary to make an appropriate
judicial decision on the matter before it.") (citing In re
Tri-Cran, 98 B.R. 609, 615-16 (Bankr. D. Mass. 1989)).
 Pearson alleged as follows: Attorney Gannon knew that
the Wadleigh Firm had represented Pearson, both before and after
his chapter 7 petition was filed, despite an irreconcilable
conflict of interest, and that if the conflict were disclosed
Pearson would realize that he had a potentially lucrative
malpractice claim against the Wadleigh Firm. Rather than assume
the risk that Pearson might retain other counsel, who could
discover the conflict, Gannon continued to represent Pearson. 
Then, in October 1995, Gannon sought appointment as special counsel
to the chapter 7 estate, with a view to negotiating a settlement
which would release the Wadleigh Firm from any liability, either
to Pearson or the chapter 7 estate, arising out of the BWI matter. 
When First Bank objected to the Gannon appointment, Gannon
ostensibly withdrew as special counsel but continued to participate
in the settlement negotiations.
 Notwithstanding these allegations, the bankruptcy court
ruled that since Gannon was not representing the chapter 7 estate,
Bankruptcy Rule 2014 did not require him to make any such
disclosure. See Pearson, 210 B.R. at 503. The record on appeal
itself plainly demonstrates, however, that (i) Pearson met the
applicable "colorable claim" standard, and (ii) the bankruptcy
court erred in failing to consider whether to exercise its
discretion to authorize discovery and/or an evidentiary hearing.
 To begin with, Gannon failed to disclose the conflict of
interest existing at the time he commenced his representation of
Pearson qua chapter 7 debtor. See Rome v. Braunstein, 19 F.3d 54,
57 (1st Cir. 1994). Instead, he submitted the verified statement
required under Fed. R. Bankr. P. 2014, which unequivocally asserted
that there were no conflicts of interest which would prevent him
from representing Pearson in the chapter 7 proceeding.
 The appellees respond that Rome is inapposite, since it
merely held that counsel representing a debtor estate must disclose
such conflicts of interest. Their contention is without merit.
Although Rome involved conflicts of interest by counsel employed
to represent the debtor estate, neither Rome nor Bankruptcy Rule
2014 remotely suggests that conventional conflict-of-interest rules
are inapplicable to other counsel in bankruptcy proceedings. Here,
Attorney Gannon made an affirmative misrepresentation to the court,
which did not comport with his duty of candor. See, e.g., NHRPC
3.3(a)(1), comment ("There are circumstances where failure to make
a disclosure is the equivalent of an affirmative
misrepresentation."); In re Tri-Cran, 98 B.R. at 616 ("'Since
attorneys are officers of the court, their conduct, if dishonest,
would constitute fraud on the court.'") (citation omitted); cf.
Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994)
("Every lawyer is an officer of the court . . . [and] he always has
a duty of candor to the tribunal."); United States v. Shaffer
Equip. Co., 11 F.3d 450, 457 (4th Cir. 1993) ("[A] general duty
of candor to the court exists in connection with an attorney's role
as an officer of the court."); cf. also Erickson v. Newmar Corp.,
87 F.3d 298, 303 (9th Cir. 1996) ("[I]t is th[e] court which is
authorized to supervise the conduct of the members of its bar . .
. [and has] a responsibility to maintain public confidence in the
legal profession.").
 The record plainly reflects that Attorney Gannon did not
simply remain silent, but instead submitted the verified statement
required by Bankruptcy Rule 2014, asserting without qualification
that he had "no connections" with any Pearson creditors. 
Furthermore, not only was the verified statement demonstrably
false, but Gannon submitted chapter 7 asset schedules which failed
to list potential conflict-of-interest claims against himself and
the Wadleigh Firm. Whatever the precise dimensions of the duties
of disclosure imposed upon counsel under the Rules of Bankruptcy
Procedure, we cannot envision that they offer comfort for
affirmative misrepresentations to the court itself. 
 In a related vein, referencing the filings submitted in
connection with the abortive attempt by the chapter 7 trustee in
October 1995 to have Gannon appointed special counsel to litigate
the chapter 7 estate's claims against First Bank, the bankruptcy
court observed that appellees' willingness to make these factual
disclosures belied any intent to deceive the court. See Pearson,
210 B.R. at 501 ("[T]he facts of possible conflict were spread upon
the record of this Court . . . ."). As the record on appeal
plainly reflects, however, in so doing the Wadleigh Firm assumed
much less risk of exposure than would have obtained upon the filing
of an accurate verified statement under Bankruptcy Rule 2014.
 First, as the bankruptcy court itself recognized, the
disclosures made by the Wadleigh Firm in 1995 were "not complete
in all details." Id. The motion to appoint Gannon as special
counsel to the chapter 7 trustee asserted that the Wadleigh Firm
represented First Bank in other cases of "debt restructuring and
work outs," but that it "did not represent [First Bank] in
connection with its administration or collection of the loan made
to Bradford Woods." Although the motion to appoint Gannon as
special counsel to the chapter 7 trustee acknowledged that the
Wadleigh Firm incorporated Spring Pond, it failed to disclose that
Pearson had alleged, in state-court complaint No. 90-E-1082, that
Spring Pond was the vehicle employed to further First Bank's
alleged conspiracy with the Tamposis.
 Second, the application for the appointment of Gannon as
special counsel, filed in October 1995 by the chapter 7 trustee and
Gannon, represented in conclusory fashion to the bankruptcy court
that Gannon's recent settlement of the chapter 7 estate's claims
against the Tamposis "eliminate[d]" any conflict which might
otherwise have prevented the Wadleigh Firm from representing the
chapter 7 estate. Yet even now the Wadleigh Firm articulates no
plausible explanation for ascribing such curative effect under any
fair reading of the governing ethical rules, see supra Section
II.A., given the fact that the Wadleigh Firm's conflicts of
interest persisted after the settlement with the Tamposis. Indeed,
this very point was forcefully made by none other than First Bank,
in its opposition to the chapter 7 trustee's motion to appoint
Attorney Gannon as special counsel to the chapter 7 estate.
 The assessment made by the bankruptcy court that it was
enough that appellees had "spread the facts on the record" 
likewise misses the mark. The motion to appoint Gannon as special
counsel to the chapter 7 trustee was granted ex parte by the
bankruptcy court the day after it was filed by the chapter 7
trustee. But when First Bank interposed its objection, the chapter
7 trustee and Gannon promptly requested that the bankruptcy court
summarily vacate its ex parte appointment of Gannon and schedule
the matter for hearing. Whereupon a compromise was reached before
the hearing could be held, and Attorney Gannon then proposed that
the bankruptcy court cancel the scheduled hearing as moot. 
Thereafter, at the hearing held to consider the newfound
compromise, neither First Bank nor the chapter 7 trustee adverted
to the conflict-of-interest issue, neither Attorney Gannon nor
Pearson appeared, and the bankruptcy court neither focused nor
ruled on the matter.
 Moreover, even assuming Attorney Gannon had no
affirmative obligation to disclose the conflict of interest at the
time the chapter 7 case commenced, such a duty plainly would have
arisen under the Bankruptcy Rules upon his appointment as special
counsel to the chapter 7 estate. Indeed, the present record
discloses additional evidence that appellees may have circumvented
effective bankruptcy court oversight, thereby enabling Gannon to
assume the role of de facto special counsel for the chapter 7
estate even after the bankruptcy court had vacated his ex parte
appointment, and to exert influence in negotiating a release of any
conflict-of-interest claims against the Wadleigh Firm: (i) a
November 14, 1995, letter from First Bank's counsel to Attorney
Gannon stated: "As you know, the settlement we reached was
conditioned, among other things, on no further resources needed to
be expended preparing for the [upcoming] hearing [on Gannon's
appointment as special counsel]." (emphasis added); (ii) the same
letter from First Bank reminded Attorney Gannon that he had
"agreed" to contact the bankruptcy court to withdraw the ex parte
motion seeking his appointment as special counsel to the chapter
7 estate.
 The November 14, 1995, letter from First Bank advised
Gannon that the withdrawal of the ex parte motion for his
appointment as special counsel to the chapter 7 trustee was a
negotiated condition of the settlement, and further suggested in
its reference to "we" that appellees may have regarded Gannon as
an active participant in the settlement negotiations.
 Although the November 15 motion to withdraw the ex parte
motion for Gannon's appointment represented that the chapter 7
trustee and First Bank had "agreed" to the compromise, while noting
that the compromise was "acceptable to the Debtor," the term
"acceptable" is hardly unambiguous. On the one hand, it may have
meant that Gannon and Pearson simply signed off on the compromise
after the chapter 7 trustee and First Bank finished negotiating its
terms. On the other hand, it may have meant that Gannon exercised
some undisclosed influence in proposing and/or drafting the terms
of the compromise, and that he participated in negotiating those
terms.
 Attorney Gannon faxed First Bank's counsel on February
13, 1996, proposing specific language for inclusion in the
settlement agreement which would preserve First Bank's allowed
claims against the chapter 7 estate to the extent the chapter 7
trustee were ever to receive payment of any monies from
International Explorations Ltd. (IEL), in which Pearson allegedly
held a 2% interest. Appellees discount this evidence on two
grounds: (i) Pearson admitted that his IEL interest was worthless,
and (ii) First Bank simply requested that Gannon supply it with the
name of the corporation ("IEL") so that First Bank could insert the
corporate name in a settlement provision previously negotiated
between the chapter 7 trustee and First Bank. Neither response is
conclusive.
 First, it is not clear from the present record what
motive First Bank would have had to negotiate a settlement
provision which preserved an interest it considered worthless. 
Second, and much more importantly, Gannon did not simply provide
First Bank with IEL's name; he attached the entire settlement
provision to the February 13th communication, thereby suggesting
that the Wadleigh Firm was not only actively proposing last-minute
settlement terms, but that it was doing so to protect First Bank's
interests, rather than Pearson's.
 Finally, the release contained in the final settlement
agreement itself states that the chapter 7 estate is relinquishing
all BWI-related claims against First Bank, its directors and
attorneys. Notwithstanding the context, however, at the time it
approved the chapter 7 trustee's motion to abandon "[a]ny and all
conflict of interest and breach of the duty of loyalty claims
relative to the Wadleigh Law Firm and its attorney William S.
Gannon, if any[,]" the bankruptcy court refused to determine the
meaning or scope of the language employed in the final settlement
release. (Emphasis added.) Instead, it simply concluded that
there was no evidence of "devious intent" on the part of appellees. 
 The bankruptcy court found that the Wadleigh Firm and
Attorney Gannon had no "inkling" that Pearson might have viable
malpractice claims against them, and therefore they could not have
anticipated that the "boilerplate" release provision would absolve
them from any such claims. Pearson, 210 B.R. at 503. We are
unable to discern the evidence upon which this finding is based.
Nor are we persuaded, given the record evidence relating to the
Wadleigh Firm's conflicted interests in representing Pearson, First
Bank, and the Tamposis, see supra Section I (No. 90-E-1082) &
Section II.A., that the proffered release, objectively viewed in
context, necessarily amounted to mere "boilerplate." We briefly
explain.
 The Wadleigh Firm, which served as First Bank's
"attorney," and Attorney Tucker, a Wadleigh Firm partner and First
Bank "director," had every reason and occasion to be cognizant of
their conflicted interests, and, therefore, that Pearson's
potential malpractice claims against all those covered by the
"boilerplate" release, including themselves, might be barred by the
release. Viewed in actual context, therefore, the terms of the
"boilerplate" release provision itself may constitute probative
evidence of a fraudulent intent which the bankruptcy court may
revisit and scrutinize on remand.
 C. The Putative Waiver of Conflicts of Interest
 The bankruptcy court nevertheless ruled that even
assuming a conflict of interest, Pearson either consented to
representation by the Wadleigh Firm or acquiesced in perpetrating
a fraud upon the court, since Pearson neither notified the
bankruptcy court of the grounds giving rise to any conflict nor
instructed Attorney Gannon to do so. See Pearson, 210 B.R. at 502. 
The bankruptcy court noted as well that Pearson had encouraged,
even badgered, the Wadleigh Firm into representing him, and only
belatedly objected in 1996 when Attorney Gannon demanded that
Pearson pay attorney fees. See id. at 502-03. We address these
matters in turn.
 First, under the governing ethical rules, some conflicts
of interest are considered so fundamental that even an anxious
prospective client is deemed incapacitated from providing informed
consent. See, e.g., NHRPC 1.9; Kevlik, 724 F.2d at 850-51.
"'[W]hen a disinterested lawyer would conclude that the client
should not agree to the representation under the circumstances, the
lawyer involved cannot properly ask for such agreement or provide
representation on the basis of the client's consent.'" Kelley's
Case, 627 A.2d 597, 600 (N.H. 1993) (quoting Comments, ABA Model
Rule 1.7(b)) (emphasis added). In these circumstances, it is
exceedingly difficult to envision that a disinterested attorney
could have advised Pearson to consent to representation by the
Wadleigh firm given the circumstances alleged in Pearson's state-
court complaint. See supra Section I (describing allegations in
No. 90-E-1082).
 Second, although we leave it to the bankruptcy court on
remand to determine whether any conflict of interest was
sufficiently serious to preclude its competent waiver by Pearson, 
the matter at issue went well beyond whether Pearson's implied
consent could be considered effectual, since Gannon did not simply
remain silent concerning any potential conflict of interest. 
Rather, he presented to the bankruptcy court the unconditional
representation that he had "no connections with [Pearson's]
creditors or any party in interest, their respective attorneys, and
accountants," see supra Sections I & II.B., rather than reporting
that such connections did in fact exist, but that Pearson knowingly
had waived any such conflict of interest. Whatever safeguards
counsel may realize in remaining silent do not extend to deliberate
efforts to mislead the court through inaccurate representations. 
Clearly then, the Wadleigh Firm and Attorney Gannon acted at their
peril, and appellees may not ward off all discovery and a further
evidentiary inquiry simply by resorting to conclusory assertions
that Pearson consented. The bankruptcy court should address these
concerns on remand.
 D. The Harm Caused by the Alleged Concealment
 As the bankruptcy court did not determine the value of
the Pearson claims against the Wadleigh Firm, the record on appeal
does not permit a determination as to whether, and if so to what
extent, any such conflicts of interest may have affected the
chapter 7 estate.
 III
 CONCLUSION
 We therefore conclude that the factfinding process was
prematurely suspended by the bankruptcy court's decision to deny
the Rule 9024 motion to set aside the compromise. As its decision
constituted an abuse of discretion, given the evidence of serious
conflicts of interest, supra, we remand to the bankruptcy court for
further proceedings consistent with this opinion.
 We neither prescribe particular factfinding proceedings
for use on remand, nor presuppose any assessment of the record
evidence ultimately gathered. Finally, should it be determined
that a fraud was perpetrated upon the bankruptcy court, it is
within its discretionary power to tailor an appropriate remedy in
the first instance.
 The district court order is vacated and the case is
remanded to the bankruptcy court for further proceedings consistent
with this opinion. Costs to appellant.
 SO ORDERED.