**Salim AOUDE, Plaintiff, Appellant,**

v.

**MOBIL OIL CORPORATION, Defendant, Appellee.**

**Nos. 89–1690, 89–1696.**

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1989.

Decided Dec. 29, 1989.

David Berman, with whom Berman & Moren, Lynn, Mass., was on brief, for plaintiff, appellant.

Robert M. Gault, with whom Andrew Nathanson, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., and Elizabeth T. Walker, Alexandria, Va., were on brief, for defendant, appellee.

Before BREYER, VAN GRAAFEILAND * and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Plaintiff-appellant Salim Aoude rails against the involuntary dismissal of two suits which he filed against defendant-appellee Mobil Oil Corporation and others. The record of the case amply illustrates that, though the "bread of deceit is sweet to a man ... afterwards his mouth shall be filled with gravel." Proverbs 20:17. We told a part of the tawdry tale in *Aoude v. Mobil Oil Corp.*, 862 F.2d 890 (1st Cir. 1988), and now write the final chapter.

I

The general scenario of plaintiff's effort surreptitiously to acquire a Mobil franchise from another service station operator, John Monahan, and to force Mobil to accept the transaction, was recounted at some length in our earlier opinion. *Id.* at 891–92. Rather than revisit that narrative, we refer the interested reader to it, noting especially that, to gain bargaining leverage with Mobil, Aoude concocted, backdated, and persuaded Monahan to sign, a bogus purchase agreement. *See id.* at 891 & n. 2. The counterfeit reflected a price nearly twice what had actually been paid for Monahan's interest. When Mobil refused to bow to this artificially induced pressure, Aoude brought suit in state court, alleging, on a number of theories, that he had become the owner of Monahan's franchise, notwithstanding Mobil's refusal—as was its right—to honor the purported assignment. The complaint sought equitable relief and damages.

* Senior Circuit Judge, of the Second Circuit, sitting by designation.

Plaintiff had given the ersatz agreement to his then-counsel, and it formed the complaint's centerpiece. Aoude knew that counsel had annexed the false agreement to the complaint instead of the real one; indeed, Aoude approved the filing of the suit on that basis. By his own admission, he "did not ask [his attorney] to amend the complaint" to retract the lie. Mobil, unaware that the agreement was a work of fiction, removed the case to federal district court based on diversity of citizenship and amount in controversy.

During the first four months of 1988, numerous depositions were conducted and other discovery undertaken. Aoude participated fully, plying Mobil with interrogatories and requests for document production and responding to Mobil's discovery initiatives. When Monahan's deposition was taken, the truth began to emerge. Later, during his own deposition, Aoude was confronted with Monahan's testimony and only then admitted the scheme. It was not until May 26, 1988 (almost three months after his deposition was taken) that plaintiff moved to amend his complaint to substitute the authentic purchase agreement for the bogus one. In the meantime, discovery had continued and a blizzard of legal documents had fallen. We single out four developments:

1. On February 24, Mobil threatened Monahan with franchise revocation based partly on his dealings with Aoude.

2. Aoude engaged new counsel.

3. On May 5, Aoude filed a second action in the same federal district court. The complaint in the "new" case adopted all the factual allegations made in the first case and prayed for essentially the same relief, but abandoned plaintiff's earlier reliance on the phony contract. Then, citing Mobil's February 24 letter to Monahan, the new complaint proceeded to allege violations of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2806 (1982).

4. On May 17, Mobil moved to dismiss both actions because of Aoude's fraudulent practices.

We need not wax longiloquent as to ensuing events. On June 2, the district court granted preliminary injunctive relief in Mobil's favor;[1] the court also denied plaintiff's motion to substitute the authentic agreement for the ersatz one. Thereafter, the district court heard arguments on defendant's dismissal motions and took them under advisement. Some months later, the court filed a memorandum decision dismissing both actions. In its rescript, the court observed that "plaintiff's entire case rests on a false foundation."

These appeals, one for each of plaintiff's two suits, followed.

## II

■ At the outset, we address the standard of review. We believe that the district courts must be accorded considerable latitude in dealing with serious abuses of the judicial process and that the trier's determination to dismiss a case for such a reason should be reviewed only for abuse of discretion. *See, e.g., Link v. Wabash R.R. Co.,* 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962); *HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.,* 847 F.2d 908, 916–17 (1st Cir. 1988); *cf. Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1081 (1st Cir.1989) (district court's choice of sanctions for discovery violation will only be set aside for abuse of discretion); *Damiani v. Rhode Island Hospital,* 704 F.2d 12, 15–16 (1st Cir.1983) (similar).

While broad, the trial court's discretion is not unlimited. The judge must consider the proper mix of factors and juxtapose them reasonably. "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988); *see also Anderson v. Cryovac,*

---

1. In our earlier opinion, we upheld this injunction. *Aoude,* 862 F.2d at 892–96.

*Inc.*, 862 F.2d 910, 923 (1st Cir.1988) (to warrant reversal for abuse of discretion, it must "plainly appear[ ] that the court below committed a meaningful error in judgment").

 Although dismissal need not be preceded by other, less drastic sanctions, *Farm Constr. Services, Inc. v. Fudge*, 831 F.2d 18, 20 (1st Cir.1987) (per curiam); *Damiani*, 704 F.2d at 15, it is an extreme remedy, and should not lightly be engaged. Thus, a district court may dismiss a case only "when circumstances make such action appropriate," *Link*, 370 U.S. at 633, 82 S.Ct. at 1390, and after "thoughtful consideration of all the factors involved" in a particular case, *Damiani*, 704 F.2d at 17. Because dismissal sounds "the death knell of the lawsuit," district courts must reserve such strong medicine for instances where the defaulting party's misconduct is correspondingly egregious. *Id.; see also D.P. Apparel Corp. v. Roadway Express, Inc.*, 736 F.2d 1, 3 (1st Cir.1984); *Corchado v. Puerto Rico Marine Management, Inc.*, 665 F.2d 410, 413 (1st Cir.1981), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In calibrating the scales, the judge should carefully balance the policy favoring adjudication on the merits with competing policies such as the need to maintain institutional integrity and the desirability of deterring future misconduct. *See HMG Property*, 847 F.2d at 917; *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam).

### III

 Exercising great circumspection, the court below suggested several sources from which it derived authority to enter the dismissal orders. We are not similarly inclined. It strikes us as elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court.

### A.

 A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. *See, e.g., Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir.1989); *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir.1976); *England v. Doyle*, 281 F.2d 304, 309 (9th Cir.1960); *United Business Communications, Inc. v. Racal–Milgo, Inc.*, 591 F.Supp. 1172, 1186–87 (D.Kan. 1984); *United States v. ITT Corp.*, 349 F.Supp. 22, 29 (D.Conn.1972), *aff'd mem.*, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973).

 Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms. In our estimation, however, the present case is a near-classic example of the genre. Appellant's bad faith is manifest. By Aoude's own admission, he fabricated the purchase agreement; gave it to his lawyer; read the complaint before it was filed; realized that counsel, acting on his behalf, proposed to annex the bogus agreement to the complaint (thus representing it to be authentic); and nevertheless authorized the filing. Thereafter, Aoude and his counsel continued to act out the charade until, in the course of pretrial discovery undertaken by Mobil, Monahan revealed a glimmer of the truth. Even then, Aoude hedged his bets, forcing Mobil to piece together the sordid story bit by bit. Following Monahan's deposition testimony, more than three months elapsed before plaintiff asked to amend his complaint to substitute the real agreement for the invented one. The only conceivable reason for Aoude's elaborate duplicity was to gain unfair advantage, first in the dispute, thereafter in the litigation. The tactic plainly hindered defendant's ability to prepare and present its case, while simultaneously throwing a large monkey wrench into the judicial machinery. In our view,

this gross misbehavior constituted fraud on the court. *See Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir.1987) (fraud on court may exist where witness and attorney conspire to present perjured testimony); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir.1978) (same, where party, with counsel's collusion, fabricates evidence).

B.

■ The next question, of course, requires that we examine the options of a federal district judge confronted by such odious machinations. It is apodictic that federal courts possess plenary authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link*, 370 U.S. at 630–31, 82 S.Ct. at 1388–89 (footnote omitted). The Civil Rules neither completely describe, nor purport to delimit, the district courts' powers. *See HMG Property*, 847 F.2d at 915; *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir. 1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986). Rather, the district courts retain the inherent power to do what is necessary and proper to conduct judicial business in a satisfactory manner. As we have said, that inherent power is "rooted in the chancellor's equity powers, 'to process litigation to a just and equitable conclusion.' " *HMG Property*, 847 F.2d at 915 (quoting *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir.1978)). The courts' inherent power includes "the ability to do whatever is reasonably necessary to deter abuse of the judicial process." *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 567 (3d Cir.1985) (en banc); *see also Brockton Savings Bank*, 771 F.2d at 11.

There is an irrefragable linkage between the courts' inherent powers and the rarely-encountered problem of fraud on the court. Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system. As Justice Black wrote in a case involving a not-dissimilar fraud:

[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.... The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944).[2] All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process—to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would, we think, foster the very impotency against which the *Hazel–Atlas* Court specifically warned.

■ We find the caselaw fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court. The Supreme Court said so in *Hazel–Atlas*, albeit in dicta. *Id.* at 250, 64 S.Ct. at 1003. The most closely analogous cases we can find, in our own circuit and in a variety of other courts, stand for much the same proposition. *See, e.g., Brockton Savings Bank*, 771 F.2d at 11–12 (affirming district court's entry of default judgment under court's inherent powers in response to defendant's abusive litigation practices); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir.1983) ("courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice"); *Eppes v. Snowden*, 656

---

**2.** In *Hazel–Atlas*, the relief awarded took the form of vacating a judgment long after it had become final, and prohibiting the judgment-holder from relitigating its claim. 322 U.S. at 250–51, 64 S.Ct. at 1003–04.

F.Supp. 1267, 1279 (E.D.Ky.1986) (where fraud committed, court has "inherent power [to dismiss] ... to protect the integrity of its proceedings"); *United States v. Moss–American, Inc.*, 78 F.R.D. 214, 216 (E.D.Wis.1978) (similar); *see also C.B.H. Resources, Inc. v. Mars Forging Co.*, 98 F.R.D. 564, 569 (W.D.Pa.1983) (dismissing under Fed.R.Civ.P. 41(b) where party's fraudulent scheme, including use of a bogus subpoena, was "totally at odds with ... the notions of fairness central to our system of litigation"). In most of these cases, we hasten to add, the challenged conduct seems, arguably, less reprehensible than in the case at bar.

### C.

Plaintiff offers a plethora of reasons why, even if the court had power to dismiss, the remedy ought not to have been employed in his case. We reject all of these asseverations, commenting briefly as to five of them.

1. *Materiality.* Plaintiff argues that his deceit, if not entirely excusable, falls short of furnishing a basis for dismissal since "[t]he attaching of the incorrect agreement to the Complaint ... did not in any way interfere with Mobil's ability to litigate the case nor did it interfere in any way with the District Court's ability to render a 'rightful decision.'" Appellant's Brief at 26. We disagree. The bogus agreement clearly had the capacity to influence the adjudication and to hinder Mobil's presentation of its case. The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct. When Aoude concocted the agreement, and thereafter when he and his counsel annexed it to the complaint, they plainly thought it material. That being so, "[t]hey are in no position now to dispute its effectiveness." *Hazel–Atlas*, 322 U.S. at 247, 64 S.Ct. at 1002. *See also Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521–22, 51

S.Ct. 501, 502, 75 L.Ed. 1243 (1931) (litigant who engages in misconduct "will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent").

2. *Right to a Hearing.* Appellant claims that the district court erred in not conducting an evidentiary hearing. He is wrong. In the first place, motions do not usually culminate in evidentiary hearings. *See* Fed.R.Civ.P. 43(e) (court may "hear" motion and determine ancillary facts on affidavits or depositions). Second, we regularly turn a deaf ear to protests that an evidentiary hearing should have been convened but was not, where, as here, the protester did not seasonably request such a hearing in the lower court. This appellant knows the rule at first hand. *See Aoude,* 862 F.2d at 894 (a matter can adequately be "heard" on the papers so long as "the parties ha[d] a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions") (discussing necessity for hearing on preliminary injunction); *see also Morales–Feliciano v. Parole Board,* 887 F.2d 1, 7 (1st Cir.1989) (civil contempt finding does not require evidentiary hearing when none requested below); *cf. Beaulieu v. United States Internal Revenue Service,* 865 F.2d 1351, 1352 (1st Cir.1989) ("it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal").

Here, the record before the trial court was compendious; the *material* facts were undisputed; notice and the opportunity for presentment were abundant (the district court entertained not only evidentiary submissions, such as deposition transcripts and affidavits, but briefs and oral arguments); and the court based its dispositive findings of fact largely on plaintiff's own admissions. No more was required.[3]

---

**3.** Because of (a) the prejudice accruing to defendant by reason of plaintiff's fraud, (b) the concomitant interference with the court's adjudicatory function, (c) the public interest in the integrity of the judicial system, and (d) the centrality

of the fraud to the matters at issue in the litigation, the dismissal orders did not contravene due process or conflict with what might remain of the "mere punishment" doctrine enunciated in *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42

3. *Blaming the Lawyer.* Aoude's argument that the district court unjustly visited the sins of counsel upon the client cannot withstand scrutiny. It may well be that there are cases where it would be inappropriate and a "deplorable kind of injustice" mechanically to hold litigants bound by every lawyerly misdeed, no matter how innocent the client or culpable the attorney. *Link,* 370 U.S. at 645, 82 S.Ct. at 1396 (Black, J., dissenting). But, here, by his own account, Aoude (not his lawyer) conceived the fraudulent scheme; Aoude (not his lawyer) introduced the apocryphal agreement into the discussions with defendant; Aoude gave the document to the lawyer and authorized the filing of the complaint, knowing that the fake agreement was appended to it. These facts, we believe, bring into play the doctrine *in pari delicto. See, e.g., Pantely v. Garris, Garris & Garris, P.C.,* 180 Mich.App. 768, 447 N.W.2d 864, 868 (1989); *cf. Montplaisir v. Leighton,* 875 F.2d 1, 7–8 (1st Cir.1989); *id.* at 8 (Aldrich, J., concurring). There is not the slightest unfairness in holding plaintiff responsible for the bitter fruit of the scheme which he masterminded and in which he and his attorney jointly participated.

■ 4. *Leave to Amend.* Under the Civil Rules, leave to amend a complaint "shall be freely given when justice so requires...." Fed.R.Civ.P. 15(a). In June 1988, some six months after suit was started, the district court refused to allow appellant to scrap the bogus agreement and append the true agreement to the complaint in its place. This denial of his motion to amend, Aoude says, constituted an abuse of discretion. His position is unsupportable.

It is settled that a district court may deny a motion to amend in cases of "undue delay, bad faith or dilatory motive on the part of the movant." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Given the scurrilous course of conduct on which Aoude had embarked, Monahan's unexpected revelation of the truth, and the pendency of defendants' dismissal motions, it is hard to envision a clearer case of bad faith. We do not believe, as appellant would have it, that the lower court was limited to considering only bad faith *in the making of the motion.* Because leave to amend calls into play "the pertinent balance of equitable considerations," *Quaker State Oil Refining Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1517 (1st Cir.1989), common sense demands that the movant's bad faith be viewed through a wider lens. Doing so here leaves no doubt but that the denial of the suggested amendment was warranted. *See, e.g., Local 472, etc. v. Georgia Power Co.,* 684 F.2d 721, 724 (11th Cir.1982) (district court had discretion to deny motion to amend which was "nothing more than an effort to avoid an adverse summary judgment"); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given *when justice so requires....*") (emphasis supplied).

■ 5. *The Second Suit.* Appellant remonstrates that, whatever disposition may be made of his original suit, his second suit was filed without any reference to the bogus agreement and should not have been dismissed. The assertion will not wash. A malefactor, caught red-handed, cannot simply walk away from a case, pay a new docket fee, and begin afresh. History is not so glibly to be erased. Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear. Thus, to the extent that the two complaints paralleled each other, the second suit was, for the reasons already stated, appropriately jettisoned.

■ To be sure, plaintiff's second complaint can be read to allege an additional cause of action for PMPA violations based

L.Ed. 215 (1897). *See HMG Property,* 847 F.2d at 918 n. 14 (explicating status of *Hovey* principle); *see also Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 349–54, 29 S.Ct. 370, 379–81, 53 L.Ed. 530 (1909) (limiting *Hovey*); *Puerto Rico v. SS Zoe Colocotroni,* 628 F.2d 652, 666

(1st Cir.1980) (upholding qualitatively similar ruling which "bore a direct and reasonable relation to the prejudice defendant's irresponsible conduct had already created"), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981).

on an event (the February 24 letter) which occurred after the first suit was started. That claim arguably constituted a separate cause of action. *Cf., e.g., Walsh v. International Longshoremen's Ass'n*, 630 F.2d 864, 870, 873 (1st Cir.1980). But even so, the second complaint was correctly dismissed. The first suit's outcome effectively bars Aoude from asserting ownership rights in the Monahan (Maple Street) franchise. *See Rose v. Town of Harwich*, 778 F.2d 77, 79 (1st Cir.1985) (explaining operation of claim preclusion doctrine under Massachusetts law). And in the absence of any bona fide claim to the franchise, plaintiff had no standing to sue under the statute. Some colorable claim to franchisee rights is essential to invocation of the PMPA. *See* 15 U.S.C. §§ 2802, 2803, 2805(a); *see also Atlantic Richfield Co. v. Guerami*, 820 F.2d 280, 282 (9th Cir.1987); *Brewer v. Exxon Corp.*, 626 F.Supp. 76, 80 (E.D.Tenn.1985). Ownership rights in the particular franchise are a *sine qua non* to standing under the PMPA, *see Atlantic Richfield*, 820 F.2d at 282, and appellant had none.[4]

### IV

We need go no further. Appellant chose to play fast and loose with Mobil and with the district court. He was caught out. The judge considered the relevant factors and acted well within his discretion: appellant's brazen conduct merited so extreme a sanction; Mobil, having undergone extra trouble and expense, had a legitimate claim to dismissal; and the court, jealous of its integrity and concerned about deterrence, was entitled to send a message, loud and clear.

*Affirmed.*

---

**4.** In this connection, it is well to recall that PMPA "constituted a diminution of prior rights of franchisors and thus should not be extended beyond the Act's language and purpose." *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir.1987) (citation omitted). Hence, it has regularly been held that only parties covered by the Act's plain meaning can lay claim to its protections. See *Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir.1982); *Brewer*, 626 F.Supp. at 80.