**K. Andrew HULL, et als.   Plaintiffs**

v.

**MUNICIPALITY OF SAN JUAN, et als.   Defendants**

**No.  CIV.00–2422.**

United States District Court, D. Puerto Rico.

Oct. 11, 2002.

Troncoso & Schell, San Juan, PR, for Plaintiffs.

Luis G. Martinez–Llorens, Colon, Colon & Martinez, San Juan, PR, for Defendants.

### OPINION AND ORDER

GIERBOLINI, Senior District Judge.

Pending before this court is the defendants' motion for a non-resident bond in the sum of $75,000.00 and a "Motion to

Dismiss for Fraud on the Court". Both requests are based on the plaintiffs' failure to disclose significant and relevant prior medical problems and treatment in an attempt to mislead the defendants and the court and augment the damages suffered as a consequence of the 1999 fall. (Docket entry # 45 & 73). The plaintiffs oppose both motions negating that they intentionally withheld medical information. As to the motion for a non-resident bond, they assert that their economic situation prevents them from posting such a bond. (Docket entry # 56 & 77).

## BACKGROUND

This is a tort action brought to this court pursuant to the diversity of citizenship statute. Co-plaintiff Mr. Andrew Hull is the President of Settlement Associates, Inc., a company that sells insurance and structured settlements to law firms and other companies. Co-plaintiff Patricia Rivera Hull is his wife. On November 8, 1999, Mr. Hull arrived at Puerto Rico for business. Around 7:00 p.m. he left his hotel with business associate Joseph Muñoz to have dinner at a nearby Italian restaurant. While walking on a sidewalk under construction at Condado, Puerto Rico, Mr. Hull's feet were caught in some wire mesh that was still attached to the tiles that had been installed in the sidewalk. He fell face down hitting his nose and left elbow on the ground. The plaintiffs argue that this dangerous condition was not readily visible due to the poor visibility in the area and the fact that the wire mesh was of the same color as the tiles.

The plaintiffs claim that, as a consequence of the fall, Mr. Hull suffered a nose trauma, breathing difficulty through his nose, deviated septum, head injury, strong physical pain in the cervical area and left arm, fracture of the radial head of the left elbow, pinched nerve in said area, numbness and a tingling sensation radiat-

ing to his arms and his legs, bilateral carpal tunnel syndrome of a severe nature, sleep problems, post concussion syndrome with Aphasia, mild problems with sexual dysfunction, among others. Mr. Hull underwent a decompression surgery for the bilateral carpal tunnel syndrome, a septoplasthy to correct the nose condition, an anterior cervical partial vertebrectomy, a micro discectomy and an anterior cervical fusion. Mr. Hull has been diagnosed as follows: (1) herniated nucleus pulposus C6–7 left and central with extrusion disc fragment; (2) herniated pulposus C5–6; (3) multi level neuroforaminal stenosis C5–6 and C6–7; (4) traumatic elbow injury; (5) cerebral concussion with posttraumatic symptoms, including Aphasia; (6) early cervical myelopathy resolved; (7) traumatic nasal injury; (8) bilateral carpal tunnel syndrome. See, Complaint ¶¶ 10–25, docket entry # 1; Joint Initial Scheduling Memorandum, pp. 3–6, docket entry # 6; Plaintiff's Letter of Settlement Demand, ¶¶ 13–34, Exhibit # 7, Reply to Opposition to Request for Non–Resident Bond, docket entry # 62. The plaintiffs assert that the defendants were negligent in not keeping the sidewalk in safe conditions for the pedestrians and that said negligence was the sole cause of all the injuries he endured, as above described. In total, they claim compensation in an amount no less than $2,861,000.00. *Id.* at p. 11.

Two months before the commencement of the trial scheduled for April 2002, the defendants requested us to continue it because of problems during the discovery phase of the case. Namely, because the plaintiffs' failure to provide all the medical records requested and information regarding a previous slip and fall, forced them to conduct further discovery to properly assess the true magnitude of the damages alleged in this case. (Docket entries # 36 & 41). This discovery definitely opened a can of worms. (Docket entries # 44, 47 & 48). In view of the medical evidence with-

held by the plaintiffs, we continued the trial and ordered them to furnish to the defendants all the information regarding: (1) a rear end collision suffered in 1982; (2) any other accidents and/or injuries suffered prior to November 1999; (3) any medical condition, treatment or record not previously disclosed to the defendants. (Docket entry # 52 & 54).

Meanwhile, and based on the situation above mentioned, the defendants requested the posting of a non-resident bond in the amount of $75,000.00. (Docket entry # 45). The parties were giver ample opportunity to present and further supplement their positions regarding the merits of the motion for a non-resident bond. (Docket entries # 45, 50, 56, 62, 63, 64 & 67). We ordered the plaintiffs to file a certified copy of their 2001 tax returns and any documentary evidence to substantiate the allegations of economic difficulties to post the bond. Likewise, we ordered the defendants to file evidence of the necessary costs incurred by them related to the issue of damages, particularly, those related to their efforts to obtain Mr. Hull's prior medical history. (Docket entry # 66). Both parties complied with our order. (Docket entries # 68 & 69).

Recently, the defendants filed a motion to dismiss for fraud to the court based on the same facts and theory set forth in the motion for a non-resident bond. (Docket entry # 73). The plaintiffs demur reiterating the arguments presented in opposition to the motion for a non-resident bond. (Docket entry # 77).

## NON–RESIDENT BOND

Rule 304 of the Local Rules of this Court provides that when a plaintiff is domiciled outside of Puerto Rico, a bond shall be required to secure the costs, expenses and attorneys' fees which may be awarded. The court may require an additional bond upon a showing that the original bond is not sufficient security, and may stay the proceeding in the action until such additional bond is given. There is no controversy in this case that the plaintiffs are citizens of the State of California. **See**, Uncontested Fact # 1 of the Proposed Pre–Trial Order, pp. 21 & 23, docket entry # 76. It is also undisputed that the plaintiffs have never posted a non-resident bond in this case. However, this does not mean that this court's authority to require it, or for an opposing party to request its imposition, has been waived by the mere lapse of time. Rule 304 does not impose any time limits on the court and or opposing party to so proceed. The only time limit is for the actual posting of the bond once ordered by the court. Hence, we have plenary power to consider the defendants' request for posting of a non-resident bond in excess of $250.00.

The purpose of the non-resident bond is "to ensure that a prevailing party will be able to collect a judicial award of costs, expenses, and attorney's fees from a non-resident litigant." *Murphy v. Ginorio*, 989 F.2d 566, 568 (1st Cir.1993). In determining whether a non-resident bond in excess of $250.00 should be required, a court must consider at least three (3) factors: "(1) the plaintiff's probability of success on the merits, and the background and purpose of the suit; (2) the reasonable extent of the security to be posted, if any, viewed from the defendant's perspective; and (3) the reasonable extent of the security to be posted, if any, viewed from the non-domiciliary plaintiff's perspective." *Aggarwal v. Ponce Sch. of Medicine*, 745 F.2d 723, 727–28 (1st Cir.1984).

Though we have sufficient basis to require a non-resident bond in excess of $250.00 [1], we find that we will not serve justice by following that avenue. The pur-

---

1. Without prejudging the issue of negligence, which has not been fully presented to the

pose of a bond is not to sanction the party who has incurred in wrongful acts but to safeguard a party who has the probability of prevailing in the merits. Therefore, we will focus our discussion under the parameters set forth by the Court of Appeals for the First Circuit in *Aoude v. Mobil Oil Corp., infra,* regarding fraud to the court.

It is well established that federal courts possess plenary authority to process litigation to a just and equitable conclusion and to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. **See,** *Link v. Wabash R.R. Co.,* 370 U.S. 626 at 630–31, 82 S.Ct. at 1388–89, 8 L.Ed.2d 734 (1962); *HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.,* 847 F.2d 908, 915 (1st Cir.1988). Consequently, district courts are accorded considerable latitude in dealing with serious abuses of the judicial process. **See,** *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1117 (1st Cir.1989) (and cases therein cited). Otherwise, the courts would be hindered to defend "their integrity against unscrupulous marauders" putting at risk the very fundament of the judicial system. *Id.*

## ABUSE OF THE JUDICIAL PROCESS—FRAUD

The defendants assert that the plaintiffs' misrepresentations to this court, the opposing party and their own experts and treating physicians, and the withholding of important evidence, all regarding Mr. Hull's prior medical history, is tantamount to fraud to the court. Additionally, they assert that said conduct has caused them to incur in unnecessary litigation costs. After a careful review of the record before us, we find that Mr. Hull has not been forthcoming in revealing his prior medical history and has incurred in serious and material inconsistencies in his testimonies under oath and penalty of perjury.

We consider that the worst abuse of the judicial process a litigant can incur in is fraud on the court. Fraud consists of a concealment of material fact or a reckless misrepresentation to induce another person to act. **See,** Black's Law Dictionary, 670 (7th ed.1999). Fraud on the court occurs when "a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense". **See,** *Aoude v. Mobil Oil Corp.,* 892 F.2d at 1117. "Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms." *Id.* Contrary to the plaintiffs' argument, it need not be a concoction between attorney and client.[2] What is critical is the mischievous doing, whether it comes from the party, the attorney, both or in combination with a third party. Here, the sole culprit is co-plaintiff, Mr. Hull.

## THE EVIDENCE OF FRAUD AND PERJURY

In an effort to justify Mr. Hull's failure to provide during the discovery relevant information of his prior medical history, the plaintiffs rely on the fact that question

court at this stage of the case, we believe that the plaintiffs' probability to prevail in the merits is highly questionable. Mr. Hull's credibility, in conjunction with the evidence discovered by the defendants regarding his pre-existing medical conditions, greatly diminishes their probability of obtaining an award of damages. Mr. Hull's conduct has forced the defendants to incur in unnecessary litigation costs. Though the economic situa-

tion presented by the plaintiffs, at first glance, seems precarious, a more thorough analysis of the same allows the imposition of a bond in excess of $250.00.

**2.** "Fraud on the court—a lawyer's or party's misconduct in a judicial proceeding so serious that it undermines or is intended to undermine the integrity of the proceeding." Black's Law Dictionary 671, *supra.*

# 5 of the Interrogatory submitted by the defendants excluded information of personal injury. Indeed question # 5 excludes that information[3], but the fact remains unaltered that in the answer to question # 6 of the Interrogatory[4] Mr. Hull represented to the defendants that "all the injuries...[he] had were as a result of the 11–9–99 incident which is object of the Complaint." **See**, Answers to Interrogatory, Exhibit # 3 of the Reply to Opposition to Request for Non–Resident Bond, docket entry # 62. As will be shown herein below, this representation, made under penalty of perjury, was false, for not all the injuries claimed were caused by the fall.

Though specifically asked during his September 7, 2001, deposition about prior injuries or accidents, Mr. Hull only mentioned a right wrist fracture in 1966, a hospitalization for a bleeding ulcer in 1968 and a knee surgery in 1969. **See**, Deposition Testimony, Exhibit # 4, pp. 31–36, *supra*. No mention was made of a rear end collision in 1982, where he suffered back injuries and permanent soreness in his right scapular, nor reference was made of the time when he hurt his neck laying bricks in his house back in 1995 and the concomitant diagnose of neuropathy. **See**, Case History File and Med–Legal Intake and Examination Form, Exhibit # 15 of the Motion to Dismiss for Fraud to the Court, docket entry # 73; Declaration Under Penalty of Perjury of April 6, 2002, p. 4, Exhibit # 13, Reply, *supra*. Lastly, Mr. Hull failed to mention a 1996 slip and fall in a hotel in Orlando, Florida for which he was seen by at least four (4) doctors, several diagnostic exams were performed, various conditions were diagnosed including, **SEVERE CARPAL TUNNEL SYNDROME** for which **DECOMPRESSION SURGERY WAS HIGHLY RECOMMENDED**. **See**, Medical Record at the Kerlan–Jobe Orthopaedic Clinic, Exhibit # 9, Reply, *supra*.

Now the plaintiffs try to justify Mr. Hull's failure to provide this information, claiming that "in the heat of the deposition" he simply did not remember it. We find this argument unconvincing. First of all, six (6) months before this deposition, Mr. Hull was deposed in relation to a workman's compensation claim he presented for the same facts of this action. In that deposition he was asked whether before the fall in November 1999 he had been involved in any accidents causing him to seek medical treatment. Curiously, he made reference to the same three (3) injuries suffered in the 1960's, but did not remember any other. **See**, Deposition Testimony, Exhibit # 8, pp. 31–33, Reply, *supra*.

What is most amazing is Mr. Hull's ability to, "in the heat" of the depositions related to actions in which he seeks economic redress for "catastrophic"[5] dam-

---

**3.** Question # 5:

"If during the ten years immediately prior to the date of said accident you were confined in a hospital, treated by a doctor or x-rayed for any reason, **other than personal injury**, give the name and address of each such hospital, physician, technician or clinic, the approximate date of such confinement or service, and state, in general, the reason for such confinement or service." (Our emphasis). **See**, Interrogatory, p. 2, Exhibit # 2, Reply, *supra*.

**4.** Question # 6:

"State whether since the date of said accident you have suffered any other bodily injury or illness that required the care of a doctor and, if so, state when, where and how you were injured, and describe in general the injuries suffered, or, in the alternative, state when you were ill, and describe in general the nature of the illness." *Id*.

**5.** The plaintiffs catalogued the damages endured by Mr. Hull in this case as almost of a catastrophic nature. **See**, Plaintiffs' Settlement Demand Letter of March 8, 2002, p. 8, Exhibit # 7, *supra*.

ages, remember very specific details of, e.g., a thirty five (35) year old right wrist fracture which healed with no complications, while forgetting three/four year old injuries that are related to the damages now claimed. Given the extent and nature of those younger injuries, a candid individual would have remembered them. See, Id.; Deposition Testimony, Exhibit # 4, pp. 34–36; Medical Record from the Kerlan–Jobe Orthopaedic Clinic, Exhibit # 9, supra. This rather convenient forgetfulness can be more reasonably attributed to the fact that the physical complaints, symptoms, treatment received and diagnosis obtained in relation to the omitted accidents and injuries, endured in a time frame more proximate to the 1999 fall, would have irremediably undermined the magnitude of the damages claimed, ergo, the economic compensation herein sought. Otherwise, why, absent any "heat", would Mr. Hull not mention this information to his treating physicians and experts?

It stems from the record that Mr. Hull not only failed to reveal to them that some of the symptoms and conditions he attributes to his fall in 1999 were present years before, but he expressly represented to these doctors that he had no prior history of injuries nor of back and neck pain.[6] See, Letters of Dr. William Caton to Dr. Donald Norquist of February 1 and October 20, 2000, Exhibit # 14; Letter of Dr. Vincent Fortanasce to Dr. Caton of May 1, 2000, Exhibit # 16; Patient Questionnaire at Dr. Fortanasce's office, Exhibit # 17, Reply, supra. As stated above, these representations are contradicted by Mr. Hull's

admissions on medical files not revealed to his doctors, the Workman's Compensation Board and his own attorneys.

For example, Mr. Hull's concealment and misrepresentations lead Drs. Norquist and Fortanasce to diagnose him as having suffered bilateral severe carpal tunnel syndrome as a sequel to the 1999 fall. See, Progress Notes of Dr. Norquist, Exhibit III, Opposition to Motion to Dismiss for Fraud to the Court, docket entry # 77; Dr. Fortanasce's Letter to Dr. Caton, Exhibit # 16, Reply, supra. Based on the records of these physicians, the plaintiffs' neurologic expertDr. Angel Chinea-, in turn rendered a report in which he opined that the bilateral carpal tunnel syndrome was related to Mr. Hull's November 1999 fall. Dr. Chinea concluded that this condition represented a five percent (5%) impairment of the whole person (IWP) for Mr. Hull's left hand and a ten percent (10%) IWP for his right hand. See, Neurological Evaluation, pp. 5–6, Exhibit # 6, Reply, supra. It should be noted that Dr. Chinea determined that all the conditions suffered by Mr. Hull in 1999 left him with a thirty nine percent (39%) IWP. Accordingly, the bilateral carpal tunnel syndrome represents a thirty eight point five percent (38.5%) of the total disability. In other terms, it represents over one third (1/3) of his whole body impairment. Id.

Very recently, Mr. Hull's legal representatives, in an effort to avoid sanctions under Rule 11 of the Fed.R.Civ.Proc., informed the court that their decision to include in the complaint the damage alle-

---

**6.** Mr. Hull also misrepresented to his doctors that he had suffered a nose fracture due to the 1999 fall. See, Exhibits # 14, 16 & 17, Reply, supra; Videotaped Deposition of Dr. Caton, pp. 66–67 and exhibits 2 & 8 of said deposition, Motion Submitting Transcripts of the Video Depositions that Plaintiffs Intend to Show to the Jury at Trial, docket entry # 43; Emergency Room Record at the Ashford Pres-

byterian Community Hospital, Exhibit IV, Dr. Norquist's Chart, Exhibit V, Deposition of Dr. Warren Line (E.N.T.), Exhibit VII, pp. 38 & 41, Medical Record of Dr. Michael Schwartz (1st E.N.T. that examined Mr. Hull eleven (11) days after the fall), Exhibit II, Opposition to Motion to Dismiss for Fraud to the Court, docket entry # 77.

gation of bilateral carpal tunnel syndrome was made based on the **"available** medical opinion of Mr. Hull's physicians which were **available at the time".** (Our emphasis). **See,** Opposition to Motion to Dismiss for Fraud to the Court, p. 4, docket entry # 77 Obviously, it was Mr. Hull the one who provided the attorneys with the factual information that they poured into the complaint, a complaint that Mr. Hull admitted under oath having read before it was filed and that included factual information that was accurate and correct. **See,** Hull's Deposition Testimony, p. 64, Exhibit # 4, Reply, *supra.* In view of the foregoing, it is evident that Mr. Hull misled and concealed material information from his own legal representatives and in turn, the court, regarding the extent of the actual damages suffered as a result of the 1999 fall.

It was not until October 2001, when the defendants found a cursory mention of a "slip and fall 1995" [7] buried in the medical record of Dr. Caton, that they were finally *en route* to open Mr. Hull's "Pandora's box".[8] **See,** Letter of October 30, 2001, Exhibit # 10, Reply, *supra;* Dr. Caton's medical record and Patient Evaluation and Management Services Form, p. 3, Exhibit # 8 of Dr. Caton's Videotaped Deposition, docket entry # 43. Not even the plaintiffs' attorneys were aware of that accident.[9] **See,** Letter of November 12, 2001, Exhibit

# 11, Reply, *supra.* The defendants insistently requested further specific information regarding this incident. **See,** Letters of October 30, November 13 & 28, 2001 and of January 4, 2002, Exhibit # 10, Reply, *supra.* Three (3) months after the initial request and just a week before departing to California to take the depositions of his treating physicians and experts, Mr. Hull provided, for the first time, some information about the 1996 slip and fall. **See,** Statement Under Penalty of Perjury of January 21, 2002, Exhibit # 12, Reply, *supra.*

In a statement under penalty of perjury Mr. Hull indicated that during his stay at the Hyatt Grand Regency Hotel in Orlando, Florida in late May 1996, while descending toward a restaurant to eat breakfast he fell in a spiral staircase. He further stated that:

"As a result of this accident I spent a day with my leg elevated and I was seen by the Hotel's physician a couple of days later. I was given medication to lower my blood pressure and released. **I did not receive any further treatment and I do not have any records related to the limited treatment that I received.** I do not recall the name nor the address of the physician that saw me."

*Id.* He also declared that he visited a chiropractor in 1995 because after resetting some bricks in the patio of his house,

---

7. Although the plaintiffs initially indicated that the slip and fall had been in 1995, the medical record related to this accident reflected the real date as May 1996.

8. According to Greek Mythology, Pandora's box was a jar containing a multitude of evils and plagues. When Pandora's eager curiosity drove her to open the jar to find what it contained, the evils and plagues escaped and scattered throughout the Earth making mankind miserable. The only thing that remained in Pandora's box was hope. In this case, the prior medical information that Mr. Hull kept sealed in his box was finally let loose by the

defendants' zealous execution of their duty to have the truth surface. This information has now escaped Mr. Hull's box, only to haunt him. Unfortunately, there is no hope at the bottom of his box.

9. In response to the defendants' first letter requesting information of the 1996 slip and fall, the plaintiffs' counsel responded:

"[W]e wish to know where did you came up with the information that our client sustained an accident back in 199[6]. We wish an explanation from you in this regard...".

he suffered a "tight neck and shoulders". *Id.*

Mr. Hull's selective memory strikes back. However, this time absent any "heat". While he is able to remember specific details of how the 1996 fall occurred, he is unable to remember any information of the initial medical treatment received that could help the defendants obtain relevant or leading to relevant evidence. Even worst, in a patent attempt to dissuade the defendants from further pursuing the issue, he made reference to the medical treatment received immediately after the fall but conveniently omitted any mention to the substantial treatment received a month after the fall at an orthopaedic clinic. Even assuming that he did not have any medical records to jog his memory, which is refuted by the record,[10] with little effort he could have obtained additional information to adequately fulfill his duty under Rule 26(e) of the Fed. R.Civ.Proc. This is so because his wife holds a managerial position with State Farm Insurance Co. (State Farm), Mr. Hull's health insurance provider.

Despite Mr. Hull's desperate efforts to minimize the importance of these prior accidents, with the manifest intent of halting the defendants' quest for the truth, the defendants did not surrender. Through a subpoena to State Farm, the defendants were finally able to obtain vital information regarding Mr. Hull's undisclosed prior medical history. **See**, "Motion for Brief Continuance of Trial [*sic*] Light of Medical Evidence Obtained Yesterday but Previously Undisclosed (And Denied) by Plaintiffs", docket entry # 41.

The chiropractor's records showed that in 1995 Mr. Hull's complaints included a pinched nerve in the neck, pain in the hands, numbness, sensation of pins and needles and pain in the fingers, difficulty sleeping, upper back and shoulder stress and loss of grip and strength in the right hand. At that time, Mr. Hull informed the chiropractor that he had those or similar conditions in the past but that they were not as severe. He was diagnosed as suffering a neuropathy and received three (3) treatments. **See**, Case History File and Med–Legal Intake and Examination Form, Exhibit # 15 of the Motion to Dismiss for Fraud to the Court, docket entry # 73. Certainly, Mr. Hull had more than a "stiff neck and shoulders." **See**, Statement Under Penalty of Perjury of January 21, 2002, Exhibit # 12, Reply, *supra.*

A month after the 1996 fall, Mr. Hull visited the Kerlan–Jobe Orthopaedic Clinic for complaints related to the fall at the Hyatt Hotel in Orlando, Florida. Namely, he complained of pain in the left knee and right arm, sensation of tingling and numbness in the right upper extremity, index, middle, ring and little fingers, radiating pain from the right shoulder to the hand and soreness in said area. In striking contrast with Mr. Hull's representations under penalty of perjury regarding the limited treatment received, the medical record at the Kerlan–Jobe's Clinic shows a substantial treatment. He made several visits to the clinic during 1996 and 1997, was submitted to various X–Rays, a nerve conduction and EMG study of the right upper extremity and was referred to three (3) other specialists. Among other diagnosis not relevant here, he was found as suffering a significant carpal tunnel syndrome in the right hand and wrist and a mild lateral epicondylitis in the right wrist. Decompression surgery for the carpal tunnel syndrome was suggested and Mr. Hull was advised against waiting an extensive amount of time because it would worsen

---

10. It stems from the record that on July 1997 Mr. Hull requested and obtained a copy of the medical record related to the 1996 fall injuries. **See**, Chart Notes of the Kerlan–Jobe Orthopaedic Clinic. p. 8, Exhibit # 9, Reply, *supra.*

his condition. Notwithstanding such admonition, Mr. Hull never scheduled the surgery. **See,** Drs. Neal ElAttrach and Norman Zemel's Chart Notes at the Kerlan–Jobe Orthopaedic Clinic, Exhibit # 9, Reply, *supra.* A year after the 1996 fall, Mr. Hull visited Dr. Chadwick Smith because his left knee continued bothering him. He was referred to said physician by a lawyer friend. Dr. Smith diagnosed degenerative osteoarthritis of the left knee, which he opined pre-existed the 1996 fall, and carpal tunnel syndrome in Mr. Hull's right upper extremity. **See,** Declaration Under Penalty of Perjury of April 6, 2002, Exhibit # 13, *supra.*

In addition, after being specifically ordered by the court, Mr. Hull divulged, for the first time, that he suffered a right collar bone fracture as a child. As to the 1982 rear end car accident, he mentioned that his car suffered minor damage to the rear and front and that he retained the services of an attorney. As a consequence of said collision he had X-rays taken, he received massage and ultrasound treatments for approximately one or two months and he suffered muscle stiffness from his shoulders to his waist. *Id.* at pp. 4 & 6. Regarding this accident, the chiropractor's record revealed that he suffered "back injuries" and was left with permanent soreness in his right scapular. **See,** Dr. Marazzoni's Case History File and Med–Legal Intake and Examination Form, Exhibit # 15, of the Motion to Dismiss for Fraud to the Court, docket entry # 73.

In sum, Mr. Hull's pre-existent symptoms, conditions and injuries related to prior accidents, are the same or similar to many of the complaints referred by him

now and which have been used to diagnose bilateral carpal tunnel syndrome and other conditions claimed in this case. In view of the extent and nature of Mr. Hull's prior medical history and it's direct bearing on the facts of this case, we find that the representations made by him in his statement under penalty of perjury of January 21, 2002 are unworthy of any credence. Equally so, those made in a subsequent declaration under penalty of perjury submitted on April 6, 2002 claiming that he had forgotten those prior accidents. *Id.* It is simply hard to believe that he could have consistently forgotten, at least, that he had been previously diagnosed with carpal tunnel syndrome and recommended surgery.

Even after being cornered with the undeniable truth of these medical records, Mr. Hull subscribed the above mentioned declaration of April 6, 2002. On this occasion he had the insolence of attesting under penalty of perjury that he was not "making a claim for damages in this lawsuit associated with carpal tunnel syndrome." *Id.* at p. 2. His audacity took him a step further. He also declared that his doctors "are not able to state that the condition is the result of any one event including the accident of November 8, 1999 in San Juan." *Id.* at pp. 2 & 3. These statements cannot be farther away from the truth. In fact they are clear evidence of perjury [11].

First of all, the carpal tunnel condition is specifically claimed in the complaint, not only as one of the damages he avowedly suffered, but also as grounds to sustain the compensatory damages suffered by his wife [12]. As we previously pointed out, Mr.

---

**11.** Perjury is the act or an instance of a person's deliberately making material false or misleading statements while under oath. **See,** Black's Law Dictionary 1160, *supra.*

**12.** Paragraph 30 of the Complaint reads, in its pertinent part, as follows:

"Plaintiff Patricia Rivera–Hull has sustained damages consisting of mental anguish and lost income because of her husband's accident…has taken a significant amount of time off from word due to her husband's injuries. She has taken

Hull admitted under oath that he read the complaint before it was filed and that the factual information it contained was correct and accurate. Second, in his answer to the Interrogatory he stated under penalty of perjury that all the injuries now claimed were as a result of the 1999 fall. Third, in the deposition before the Workman's Compensation Board he also declared under oath that the carpal tunnel syndrome had been related to his 1999 fall. Fourth, Dr. Chinea concluded that the carpal tunnel was related to the 1999 fall and ascribed to it specific percentages of disability. Fifth, on March 8, 2002, the plaintiffs' attorneys made to the defendants a settlement demand which included the diagnosis of carpal tunnel syndrome and the related percentages of disability ascribed to that condition. **See**, Letter of March 8, 2002, p. 7, Exhibit # 7, Reply, *supra*. Finally, it is not until thirteen (13) days after the defendants filed their motion to dismiss for fraud to the court that the plaintiffs' counsel admit that the carpal tunnel syndrome cannot be causally related to the 1999 fall, thus, conceding that it was claimed in the complaint. **See**, Opposition to Motion to Dismiss for Fraud to the Court, p. 11, docket entry # 77.

We are perplexed by the conduct displayed by Mr. Hull in this case. By concealing relevant prior medical information to his physicians and experts, Mr. Hull initiated a chain reaction that allowed him to obtain "objective" evidence with which his attorneys, in good faith, filed a claim for certain damages that, in reality, were not causally related to the facts of this case. He then attempted to hamper the presentation of the defendants' defenses in order to bolster his position and prevail. It is unquestionable that this scheme was aimed at improperly influencing the trier

of fact. In sum, we find that the defendants have presented clear and convincing evidence constitutive of fraud to the court, besides the manifest perjury in which Mr. Hull has repeatedly incurred.

## FRAUD SANCTIONS

When evidence of a fraud on the court is adduced prior to trial, the district court may fashion an appropriate pre-trial remedy to cure the effect of any misconduct. See, *Aoude v. Mobil Oil Corp.*, 892 F.2d at 1119. The choice of remedy is committed to the broad discretion of the trial court. In order to properly protect the sanctity of the judicial process, the remedy may include dismissing the action. See, *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 250, 64 S.Ct. 997, 1003, 88 L.Ed. 1250, *(overruled on other grounds); Aoude v. Mobil Oil Corp.*, 892 F.2d at 1122; *Brockton Savings Bank v. Peat Marwick, Mitchell & Co.*, 771 F.2d 5, 11–12 (1st Cir.1985) *cert. denied* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986). After carefully weighing all the circumstances in this case, we find that the dismissal of the action is the proper sanction, commensurate with Mr. Hull's conduct, to deter this type of behavior from recurring. Moreover, it is the course of action that better protects the integrity of this court. In the words of Justice Black in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 at 246, 64 S.Ct. at 1001 (1944):

[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

him to the doctor appointments,....[and] continues to go with him to the doctor appointments, evaluations, and **carpal**

tunnel surgeries...." (Our emphasis). **See**, Complaint, p. 10, docket entry # 1.

Hence, the defendants' motion to dismiss is **GRANTED**.

In addition, the plaintiffs are **ORDERED** to pay to the defendants all the reasonable attorney's fees and costs incurred in the presentation of this issue. Mr. Hull's conduct caused the defendants to incur in unnecessary litigation costs. Had he been forthcoming, at least when initially confronted with the notation in Dr. Caton's medical record regarding the prior slip & fall, the defendants would not have had to incur in the duplicative costs related to the second trip to California to depose the physicians who treated him for prior accidents. **See**, Motion Complying with Order to Submit Proof of Expenses, docket entry # 69. Neither would they have had to incur in the costs and attorney's fees related to the myriad of motions filed to bring this situation to the court's attention. **See**, Docket entries # 36, 41, 44, 45, 46, 47, 60, 62, 64, 69, 70, 71, 73, 74. Not only has Mr. Hull needlessly wasted the defendants time, effort and resources, but the court's as well. **See**, docket entries # 42, 48, 50, 61, 65, 66, 75.

**RULE 11  SANCTIONS**

Regarding the plaintiffs' counsel, we are astounded and disappointed with their reiterated characterization that the plaintiffs have voluntarily and freely provided the defendants evidence of prior accidents, that they have not purposely withheld this information and that they gave them the "clues" to look for said information. **See**, Opposition to Motion Requesting Plaintiffs to Post a Non-resident Bond, pp. 5 & 6, docket entry # 56; Plaintiffs' Sur–Reply to "Reply to Opposition to Request for Non–Resident Bond, p. 6, docket entry # 67; Opposition to Motion for Fraud to the Court, docket entry # 77". To state that the plaintiffs have voluntarily and freely cooperated in disclosing this information, is but an insult to the intelligence of the court.

Moreover, a litigant's duty under the Federal Rules of Civil Procedure is not to give "clues" for the opposing party to prove whether *vel non* it is a good detective. Our judicial system has progressed from those dark ages in which the litigation of a case was best described as the battle of the fittest. Modern litigation requires a litigant to provide useful, competent information that can reasonably and in good faith assist the opposing party to conduct a proper discovery, specially so when relevant evidence or leading to relevant evidence has been directly requested. The contrary would be totally at odds with the notions of fairness central to our system of litigation.

We have seriously pondered whether to impose sanctions upon the plaintiffs' counsel under Rule 11 of the Fed.R.Civ.Proc. Nonetheless, in light of the particularities of this case, we will not in the hope that our admonition will be sufficient to prevent them from incurring in further conduct that could transgress the boundaries of Rule 11.

**WHEREFORE,** for the reasons herein stated, the defendants' motion to dismiss this action with prejudice is **GRANTED**. In addition, the plaintiffs are **ORDERED** to pay to the defendants all the reasonable attorney's fees and costs incurred in presenting this issue to the court. Accordingly, the defendants are **ORDERED** to file, by **October 22, 2002**, a detailed statement of the reasonable attorney's fees and costs so incurred. The Pre–Trial Conference set for **October 15, 2002** and the **Jury Selection and Trial** set for **October 28 & 29, 2002 are VACATED AND SET ASIDE.**

**SO ORDERED.**

**JUDGMENT**

Pursuant to the Opinion and Order of even date granting the defendants' motion

to dismiss for fraud on the court, this action is **DISMISSED WITH PREJUDICE**. Judgment is hereby entered accordingly.

**SO ADJUDGED.**