TAYLOR, J.
Edward Herman, individually and as personal representative of the Estate of Miriam Herman, his late wife, timely appeals a final order dismissing his wrongful death medical malpractice lawsuit for fraud on the court. After a careful examination of the record, we conclude that this case fails to present the type of egregious misconduct or extreme circumstance which would warrant dismissal with prejudice and therefore reverse.

The Lawsuit

In November 1999, Miriam Herman filed a medical malpractice lawsuit against her cardiologist, Dr. Mitchell Silver, alleging that Dr. Silver caused her to go into renal failure by negligently failing to obtain a nephrology consult before clearing her for open heart surgery in April 1997. After her death in May 2001, her husband of nearly 50 years, appellant Edward Herman, was appointed as the persona! representative of her estate, and the case converted to a wrongful death suit.

Discovery

In October 2002, then-defendant Bethesda Memorial Hospital propounded requests for production, one of which asked for “any notes or diaries maintained by Edward Herman or Miriam Herman that pertain to the issues raised in this lawsuit.” A few days later, Dr. Silver’s counsel served the exact same request for production, including the same request for diaries. In January 2003, the trial court entered summary judgment in favor of Bethesda, thus removing Bethesda from the case.
*897 Although Mr. Herman did, in fact, keep a diary chronicling his wife’s medical condition from March 1997 (when she was admitted into the hospital) to July 1997, this diary was never disclosed to the defense in discovery. Mr. Herman simply never responded to either Bethesda’s or Dr. Silver’s request for. production. In August 2003, Dr. Silver filed a motion to compel production, but that motion was never set for hearing and the court never ruled on it.

First Trial

In 2006, the case went to trial. The plaintiff presented expert testimony from a cardiologist that Dr. Silver negligently failed to get a nephrology consult in spite of clear signs (based on Mrs. Herman’s BUN/creatinine levels) that, she needed treatment before being cleared for surgery. He also presented expert testimony from a nephrologist that any reasonable nephrologist would have implemented treatment and medication that would have prevented her from going into renal failure, given her medical condition.
At trial, Mr. Herman testified at length about his background, his life with Mrs. Herman, and the medical care she received. Mr. Herman testified that the first time he ever learned anything about Mrs. Herman’s renal insufficiency was when she was in the hospital after the surgery. He also testified that, before the surgery, his wife rode bicycles, went for walks, and danced.
Mrs. Herman’s deposition was taken before her death and the deposition recording was played at trial. Similar to Mr. Herman’s testimony, Mrs. Herman denied that she had problems with her kidneys prior to the surgery. She also testified that she would routinely take walks with her husband for exercise. She was not specifically asked about whether she rode bicycles or went dancing.
The Hermans’ daughter, Susan Wino-grad, testified at trial regarding her- mother’s physical activity, recounting how the family would go bike riding when she was younger. She also testified that her mother was a vibrant woman who loved dancing, but explained that her mother had to give up dancing after the surgery.
The 2006 trial resulted in a hung jury, and the case was eventually scheduled to be retried in 2010.

The Disclosure of the Diary

Shortly after Thanksgiving of 2009, Mr. Herman and Ms. Winograd had a serious argument, which culminated in Mr. Herman threatening to take her out of his will. Ms. Winograd then sent a letter to defense counsel, asserting that her father’s testimony at trial contained “many lies” and informing defense counsel of the existence of her father’s diary regarding Mrs. Herman’s medical condition.

Motion to Dismiss for Fraud

Dr. Silver subsequently filed a motion to dismiss the case for fraud upon the court. The motion alleged, in pertinent part, that Mr. Herman committed perjury in his September 2000 deposition and in his trial testimony, and that Mr. Herman intentionally withheld a diary which contradicted his sworn testimony.
The trial court held an evidentiary hearing on the motion to dismiss. At the hearing, the defense presented testimony from Ms. Winograd, Beatrice Lebow (Mrs. Herman’s sister) and Leonard Lebow (Mrs. Herman’s brother-in-law). Plaintiffs counsel requested that the trial court review Mr. Herman’s 2010 updated deposition, in which he responded to the allegations against him, in lieu of having someone read the deposition in open court.

The Alleged Falsehoods

The defense presented evidence which, according to the defense, contradicted Mr. *898 Herman’s testimony regarding his personal background as well as more substantive issues. The contradictions (or alleged contradictions) relevant to this opinion are as follows:
1) The Decedent’s Activity Level. At trial, Mr. Herman testified that, before the surgery, his wife rode bicycles, walked, and danced. However, at the evidentiary hearing, Ms. Winograd testified that none of this was true; she claimed that her father pressured her before the trial to lie and testify that her mother rode bicycles, danced, and did a lot of walking.
2) Jacket Testimony. At trial, Mr. Herman testified that his deceased wife was “with us today,” telling the jury that he was wearing a jacket that his wife bought for him. However, his daughter testified that he fabricated the story about the jacket, that his new wife, Sally, actually bought him the jacket, and that he later joked with Sally about his testimony regarding the jacket.
3) Kidney Problems Pre-Surgery. At trial, Mr. Herman testified that the first time he ever learned anything about Mrs. Herman having renal insufficiency was when she was in the hospital after the surgery. However, Mr. Herman’s diary contains several references to his wife’s kidney problems during her hospitalization in the weeks leading up to the surgery.
4) Risks of Surgery. At trial, Mr. Herman gave the following testimony regarding whether the doctors explained the risks of stroke and renal failure: “They discussed the risk of the surgery, assuming or on the basis that it was going to go favorably, but they never did discuss with us the eventualities if it didn’t go right, Dr. Silver. And that wasn’t something that was explained to us.” However, in his diary, Mr. Herman mentions that Dr. Silver discussed the risk of stroke and that Mrs. Herman would be placed on a blood thinner to reduce the risk of clotting.
5)Option of Different Hospital. At trial, Mr. Herman testified that he did not recall having a discussion with Dr. Silver in which Dr. Silver told the Hermans to consider going to a university hospital due to the seriousness of the situation. Specifically, Mr. Herman testified: “No. The essence of what you’re saying is that they didn’t have a cardiologist unit in Bethesda. It was as simple as that. They couldn’t perform the procedure there, so they had to find another hospital. And that’s how we ended up in Delray.” However, Mr. Herman’s diary alluded to a possible transfer to a university hospital.

Order of Dismissal

The trial court took the matter under advisement and later entered a written order dismissing the case for fraud on the court. The trial court did not rely upon the alleged falsehoods in Mr. Herman’s testimony regarding his personal background, finding that they were “relatively minor” and could be left as fodder for cross-examination.[1]
The court went on to find, however, that Mr. Herman “also gave false testimony that goes to the very issues presented to the jury in this case.” The court found that he gave false testimony regarding his •wife’s active lifestyle leading up to the surgery, such as her actively biking, dancing, and walking, all of which was offered *899 to establish the alleged damages occasioned by the surgery. The court also found that he “persuaded his daughter to support this fiction” at trial, giving her a list of topics to be covered and stressing the importance of telling the jury that Mrs. Herman was active prior to the subject surgery.
The court also found that Mr. Herman’s diary chronicling his wife’s medical treatment was never produced during discovery even though “multiple discovery requests required the production of the diary.” [2] The court found that the diary directly contradicted Mr. Herman’s sworn testimony at trial in several key respects: “This false testimony included when Miriam Herman developed kidney problems, the risks explained to the Plaintiffs at the time of the surgery and the option of having the surgery performed at a hospital in Miami.”
Lastly, the trial court concluded that Mr. Herman had gone so far in his efforts to mislead the jury that he testified at trial that Mrs. Herman was “with us today” because he was wearing a jacket that Mrs. Herman purchased for him. However, according to Ms. Winograd’s testimony, which the trial court found to be credible, the jacket was purchased by Mr. Herman’s second wife, Sally, after Miriam Herman’s death.
The trial court denied Mr. Herman’s motion for rehearing, prompting this appeal.

Analysis

■ On appeal, Mr. Herman argues that the trial. court’s dismissal of the case was an abuse of discretion because there was no clear and convincing evidence that he perpetrated a fraud on the court. We agree.
The trial court has the inhérent authority, in the exercise of its sound judicial discretion, to dismiss an action when the plaintiff has perpetrated a fraud on the court. Kornblum v. Schneider, 609 So.2d 138, 139 (Fla. 4th DCA 1992). “Although a dismissal imposed as a sanction is reviewed under an abuse of discretion standard, the trial court’s discretion is narrowed where dismissal is imposed for fraudulent conduct- such as that alleged here, in which a more stringent abuse of discretion standard is appropriate.” Bob Montgomery Real Estate v. Djokic, 858 So.2d 371, 374 (Fla. 4th DCA 2003).
Although a trial court has discretion to dismiss an action for fraud on the court, it should exercise this severe sanction only in extreme circumstances. JVA Enters., I, LLC v. Prentice, 48 So.3d 109, 113 (Fla. 4th DCA 2010). The requisite fraud on the court occurs where “it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter by improperly influencing the trier of fact or *900 unfairly hampering the presentation of the opposing party’s claim or defense.” Arzuman v. Saud, 843 So.2d 950, 952 (Fla. 4th DCA 2003) (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir.1989)). “Because ‘dismissal sounds the death knell of the lawsuit,’ courts must reserve such strong medicine for instances where the defaulting party’s misconduct is correspondingly egregious.’ ” Arzuman, 843 So.2d at 952 (citations omitted).
When imposing this harshest of sanctions, trial courts should weigh the “policy favoring adjudication on the merits” with the need to “maintain the integrity of the judicial system.” Id. Except in the most extreme cases where it appears that the process of the trial has itself been subverted, simple factual inconsistencies and “even- false statements” are well managed through the use of impeachment and traditional discovery sanctions. Granados v. Zehr, 979 So.2d 1155, 1158 (Fla. 5th DCA 2008); Ruiz v. City of Orlando, 859 So.2d 574, 576 (Fla. 5th DCA 2003). To support a dismissal, the court must find the “false testimony was directly related to the central issue in the case.” Morgan v. Campbell, 816 So.2d 251, 253 (Fla. 2d DCA 2002).
The Fifth District’s decision in Cox v. Burke, 706 So.2d 43 (Fla. 5th DCA 1998), is one of the leading decisions on dismissals for fraud. In Cox, the plaintiff in a legal malpractice action, which was based on the defendants’ representation of her in an underlying medical malpractice claim, gave false or inconsistent information regarding her identity, whether she had a driver’s license, her social security number, and whether she had sustained any fractures or other trauma prior to the accident at issue. Id. at 45-46. The trial court dismissed the action with prejudice. Id. at 46. On appeal, the Fifth District reasoned that although some of the alleged fraud was unproven, the plaintiff had been shown “to have given many false or misleading answers in sworn discovery that either appear calculated to evade or stymy discovery on issues central to her case.” Id. at 47. Although the Fifth District expressed some doubt about the trial court’s decision to dismiss, the appellate court nonetheless deferred to the trial court’s judgment because it was a close case: “While this court might have imposed a lesser sanction, the question in this case is close enough that we cannot declare the lower court to have abused its discretion.” Id.
Case law after Cox has emphasized that “Cox presented an extremely unusual fact pattern, wholly unlike the more conventional impeachment issues that have shown up in some more recent decisions.... ” Ruiz, 859 So.2d at 576. Indeed, the Fifth District acknowledged that in Cox it had “apparently underestimated” the “seductive power” of the remedy of dismissal. Id. at 575. Therefore, subsequent cases “have tried very, very hard to explain, and to emphasize, that this power to dismiss a lawsuit for fraud is an extraordinary remedy found only in cases where a deliberate scheme to subvert the judicial process has been clearly and convincingly proved.” Bologna v. Schlanger, 995 So.2d 526, 528 (Fla. 5th DCA 2008). “A testimonial discrepancy is usually not enough; there should be clear and convincing evidence of a scheme calculated to evade or stymie discovery of facts central to the case. This will almost always require an evidentiary hearing.” Id. As Judge Griffin pointed out in her specially concurring opinion in Bologna: “We all know that the capacity to remember and the categories of what we remember varies widely among individuals and depends on a number of common factors, such as age, stress, fatigue, emotion. I am skeptical that all of the plaintiffs in *901 the recent profusion of ‘fraud on the court’ cases are thieves and perjurers.” Id. at 530 (Griffin, J., concurring).
Here, we conclude that the trial court abused its discretion in imposing the most severe sanction of dismissal. Having conducted a thorough review of the record below, we find that the record simply fails to demonstrate clearly and convincingly that Mr. Herman sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate the matter.
With respect to the grounds that the trial court relied upon in dismissing the case, the alleged falsehoods or inconsistencies in this case were either: 1) in the nature of disputed issues of credibility which were best left for the jury to decide; 2) not actual inconsistencies at all; or 3) immaterial to the central issues in the case.
Although the trial court found Ms. Winograd’s testimony to be credible, we simply cannot accept that her testimony provided clear and convincing evidence warranting dismissal of the case. Indeed, the only person who has admitted to giving contradictory testimony in this matter is Ms. Winograd, a witness whose bias may have resulted from being cut out of Mr. Herman’s will.
Notably, most of Mr. Herman’s alleged falsehoods were not objectively verifiable lies. Rather, they were actually in the nature of disputed issues of fact which were best left for the jury to decide. For example, although Ms. Winograd testified that Mrs. Herman did not purchase the jacket that her father wore at the. 2006 trial, Mr. Herman again testified in his 2010 deposition that Mrs. Herman in fact purchased the jacket. This is simply a credibility dispute, better left for a jury to resolve.
Likewise, there is no uncontroverted proof that Mr. Herman lied about his wife’s activity levels before the surgery; rather, this was simply a case where his daughter claimed at the evidentiary hearing that he had lied about his wife’s activity levels at the 2006 trial and that he pressured her into supporting' this lie. But Mr. Herman denied this in his 2010 deposition. Moreover, Mr. Herman’s trial testimony was also supported by the deposition of Mrs. Herman herself, which was taken before her death, wherein she claimed that she and her husband would routinely take walks for exercise. Mr. and Mrs. Herman would have been in the best position to know Mrs. Herman’s activity levels before the surgery; Ms. Winograd, by contrast, did not live with her parents. The evidentiary conflicts regarding Mrs. Herman’s activity levels presented a classic jury question, and hardly amounted to clear and convincing evidence that the plaintiff undertook a scheme calculated to interfere with the judicial system’s ability to impartially adjudicate the matter. Furthermore, although the testimony regarding Mrs. Herman’s activity levels had some relevancy to damages, it is questionable that Mr. Herman’s brief testimony on this issue at the original trial was a central issue in the case.
The trial court also focused on three' alleged inconsistencies between Mr. Herman’s diary and his trial testimony: “This false testimony included when Miriam Herman developed kidney problems, the risks explained to the Plaintiffs at the time of the surgery and the option of having the surgery performed at a hospital in Miami.” However, contrary to the trial court’s findings, much of Mr; Herman’s testimony as to these matters either did not go to the heart of the claim or was not materially inconsistent with his diary.
*902 To be sure, there was an inconsistency on the issue of when Mr. Herman remembered his wife developing kidney problems. Mr. Herman did testify at trial that the first time he learned of any renal insufficiency in his wife was after the surgery, but in his diary (which he started keeping a few weeks before the surgery) he made several references to his wife experiencing kidney problems during her hospitalization before the surgery. This discrepancy, however, is not particularly pertinent to the medical malpractice claim. The entire theory of the plaintiffs case was that Dr. Silver negligently failed to get a nephrology consult in spite of clear signs that Mrs. Herman was having kidney problems before the surgery. Indeed, the second amended complaint specifically alleged that Mrs. Herman had a “known history of renal insufficiency” and that Dr. Silver failed to take proper precautions before the surgery in light of this renal insufficiency. Therefore, any inconsistency between Mr. Herman’s testimony at trial that the first time he learned of his wife’s renal insufficiency was after the surgery, and his notes in his diary mentioning the renal insufficiency a little over two weeks before the surgery, is the type of simple factual inconsistency best left for cross-examination. This inconsistency was not particularly material to the claim and cannot be deemed to have been a calculated scheme to interfere with the judicial system’s ability to adjudicate the matter impartially.
Second, Mr. Herman’s testimony regarding the doctors informing him and his wife of the risks of surgery was not actually inconsistent with his diary. Mr. Herman’s diary did mention some of the risks explained to the Hermans before the surgery. However, when Mr. Herman’s testimony at trial is read fully and in context, it was not inconsistent with his diary. His testimony at trial acknowledged that he and his wife consented to the ordinary risks attendant to the surgery, which included renal failure. He was merely suggesting in his testimony that he and his wife were not warned of, and did not consent to, the risks of surgery occurring as a result of the doctors doing something wrong. In any event, even if there were a discrepancy on this issue, it is hardly relevant given that the plaintiffs never asserted a claim that the surgery was performed without the decedent’s informed consent.
Finally, the alleged inconsistency regarding whether the surgery could have been performed at a , university hospital in Miami does not go to the heart of the case. Any inconsistency on this issue is immaterial, as it would not unfairly hamper Dr. Silver’s defense. Indeed, the fact that Mrs. Herman could have gone to another hospital is not a defense at all to the medical malpractice claim. The entire basis for the lawsuit is that Dr. Silver negligently cleared her for surgery. The hospital where the surgery ultimately occurred was irrelevant.

Conclusion

The casés where appellate courts have affirmed dismissals for fraud invariably involved situations where the fraud was blatant and uncontroverted. See, e.g., Bass v. City of Pembroke Pines, 991 So.2d 1008, 1011-12 (Fla. 4th DCA 2008) (noting that the plaintiff “intentionally omitted significant information” on multiple answers and that “there was no excuse given for these blatant omissions”). This case does not fall into that category. The evidence of fraud in this case was hardly uncontrovert-ed. The case at bar presented conventional impeachment issues and was unlike the “extremely unusual fact pattern” in Cox, where “there was a significant amount of evidence suggesting that the court could *903 not even be confident of who the plaintiff was, much less what had happened to her.” Ruiz, 859 So.2d at 576.
The dissent maintains that we are intruding too much into the trial court’s discretion, suggesting that the trial court did not abuse its discretion because “reasonable minds could differ as to the propriety of the trial court’s decision.” However, our standard of review is less deferential than an ordinary abuse of discretion standard. The reasonableness of the trial court’s decision must be judged in light of the narrowed discretion afforded to trial judges when imposing the extreme sanction of dismissal.
The dissent also portrays the trial court’s ruling as a simple credibility determination that the court resolved against the plaintiff. But the dissent’s view, if taken to its logical conclusion, could seriously jeopardize the invaluable right to trial by jury. In our view, no reasonable trial judge would have dismissed the case for fraud where many of the alleged inconsistencies did not pertain to central issues in the case, and where the remaining evidence regarding the alleged fraud was so hotly disputed. “The power to resolve disputes over the truth or falsity of claims belongs to a jury.” Jacob v. Henderson, 840 So.2d 1167, 1169 (Fla. 2d DCA 2003). As the Jacob court explained:
Trials result from factual disputes. In these disputes, the facts on one side are, at best, less true and, at worst, false or fraudulent. In nearly every intersection collision, there is only one person with the right of way. Is the fact that both drivers believe they had the right of way the result of fraud? If there are ten eyewitnesses to the collision and all agree driver A had the right of way, does that make driver B’s claim fraudulent and subject to dismissal?
Id. at 1169. Here, the trial judge was substituting its judgment for that of the jury on issues of credibility that were fundamentally jury questions.
We conclude that the nature and substance of any inconsistencies and contradictions in this case required the trial court to consider a lesser sanction, reflecting the proper balance between the policy favoring adjudication on the merits and the need to maintain the integrity of the judicial system. See Suarez v. Benihana Nat’l of Fla. Corp., 88 So.3d 349, 353 (Fla. 3d DCA 2012) (“Even if the record in this case could give rise to some inference of willful or intentional conduct, the nature and substance of the inconsistencies and contradictions required the trial court to consider some lesser sanction, reflecting the proper balance of competing interests and appropriately tailored to address the party’s conduct and the resulting prejudice.”). This case simply fails to present the type of egregious misconduct or extreme circumstance which would warrant dismissal with prejudice. We therefore reverse the order of dismissal.

Reversed.

CIKLIN, J., concurs.
LEVINE, J., dissents with opinion.

. With respect to Mr. Herman's tendencies to self-aggrandize his personal background, the trial court expressly declined to rely upon this testimony as the basis for the dismissal. Therefore, these alleged falsehoods are not relevant to this appeal.

. It appears that the trial court was merely noting that the diary should have been produced in discovery (a point which Mr. Herman concedes). We do not interpret the court’s order as dismissing the case for a simple failure to respond to a request for production. Instead, the court dismissed the case because the court believed the diary demonstrated that Mr. Herman gave false testimony. However, if the trial court in fact meant to rely upon the failure to produce the diary as a ground for dismissal, this would have been error, as the trial court never issued an order compelling Mr. Herman to respond to the discovery. See Garvin v. Tidwell, 126 So.3d 1224, 2012 WL 5232224 (Fla. 4th DCA Oct. 24, 2012) (sanctions for a discovery violation are not an appropriate remedy where the opposing party did not file a motion to compel and the trial court did not issue an order compelling discovery).